THOMAS J. BRESLIN, DEFENDANT IN ERROR, v. FRIES-BRESLIN COMPANY, PLAINTIFF IN ERROR.

Argued November 30, 1903—Decided June 20, 1904.

1. The *doctrine* of equitable estoppel applies to the internal concerns of stock corporations.  Saving, so far as public policy and the interests of creditors and other third parties are involved, the stockholders may bind themselves *inter sese* and in favor of the corporation by their own acts and agreements; and what will bind all the stockholders with respect to an obligation from the company to one of its members, will bind the company as such.
2. Unanimous consent and acquiescence of the stockholders, acted on by the parties concerned to such extent as to materially change their position, preclude the assenting stockholders as individuals and the corporation as such, from afterwards setting up legal informalities in matters of internal concern affecting only the interests of the stockholders, to the overthrow of rights that have been acquired on the faith of the consent and acquiescence.

On error to the Supreme Court.

For the plaintiff in error, *David J. Pancoast* and *Edward A. Armstrong.*

For the defendant in error, *Lindley M. Garrison* and *Thomas E. French.*

The opinion of the court was delivered by

PITNEY, J. In an action upon contract the plaintiff recovered a judgment against the defendant company for $52,306.94, principally for the amount of a balance standing

to his credit upon defendant's own books of account, plus interest thereon.   The account ran from the month of June, 1891, until the month of October, 1902, with frequent entries on both sides.   The total of the items debited to the company was about $120,000, in which were numerous items of interest;   the credits aggregated about $74,000, leaving a balance of about $46,000.   The recovery included additional interest down to the date of judgment.   It also included an item of $5,000 for salary, not entered in the books, but which is not now in dispute.   The action was commenced in November, 1902.

The defendant is a manufacturing corporation of this state, organized May 20th, 1891.   During the entire period covered by the controversy the plaintiff was a stockholder of the company and a member of its board of directors.

That portion of the account which was in controversy consisted of sundry items debited to the company and credited to the plaintiff during the years 1893, 1894, 1896, 1897 and 1898, as his share of the profits of the company's business.   The items, as stated in the plaintiff's bill of particulars, are as follows:

1893.
| April 25. | Cash, part of profits............ | $1,496 97 |
|---|---|---|

1894.
| May 13. | Cash, share of profits........... | 5,286 92 |
|---|---|---|
| Dec. 13. | Cash, 1/3 profits................ | 5,486 67 |

1896.
| July 6. | Cash, 1/3 profits, 6 months....... | 6,126 92 |
|---|---|---|
| Dec. 31. | Cash, 1/3 profits, 6 months....... | 6,141 02 |

1897.
| July 3. | Cash, 1/3 profits, 6 months....... | 6,768 58 |
|---|---|---|
| Dec. 30. | Cash, 1/3 profits, 6 months....... | 6,542 48 |

1898.
| June 30. | Cash, 1/3 profits, 6 months....... | 9,862 65 |
|---|---|---|
| Dec. 31. | Cash, 1/3 profits, 6 months....... | 10,029 94 |

$57,742 15

The case shows that in the company's ledger these items were entered simply as "cash," because they were posted from the cash-book, but that in the cash-book they were entered up as "profits."

The principal questions raised by the bills of exceptions are whether there was any lawful evidence justifying a finding by the jury that these amounts, respectively, were lawfully declared and set apart to the plaintiff as dividends by the board of directors; and if so, whether payment thereof had been demanded before suit brought.

The evidence returned with the bills of exceptions shows that, under the instructions given by the justice presiding at the trial, the jury could reasonably find the following facts: The defendant company, during the period in question, was successful in business. No question was made that the profits, alleged to have been divided, were in truth earned, and so the prohibition of section 30 of the General Corporation act, as construed in *Appleton* v. *American Malting Co.,* 54 *Atl. Rep.* 454, has no applicancy. It was what is commonly known as a "close corporation." The original incorporators were six in number—Frederick A. Fries, Thomas J. Breslin (the plaintiff), John M. Carroll, Edward McGill, P. J. Murphy and James G. Carroll. From the incorporation of the company until May 18th, 1893, they were the only stockholders and together constituted the board of directors. The capital stock was originally $50,000, divided into shares of $100 each, and remained at that amount until the date last mentioned. It was held as follows: Fries, seventy-five shares; Breslin, seventy-five shares; John M. Carroll, one hundred shares; McGill, fifty shares; Murphy, one hundred shares; James G. Carroll, one hundred shares. On or before May 18th, 1893, at a meeting attended by all these parties—apparently treated as a meeting of directors rather than of stockholders—a resolution was adopted requiring the conversion of all the original stock, except that held by Fries and Breslin, from common into preferred stock, entitled to cumulative preferred dividends at fifteen per cent. per annum. Four of the parties voted in favor of this resolution. Murphy and

McGill voted in opposition; they held at the time one hundred and fifty out of five hundred votes—a little less than one-third. Pursuant to the resolution, and at the same meeting, the secretary wrote across the face of the stock certificates held by the two Carrolls, Murphy and McGill the words "Preferred stock, 15 per cent. cumulative." These certificates, or substituted certificates similarly inscribed, have been outstanding at all times since. The jury had a right to find from the evidence that, as a part of the plan of creating "preferred stock," it was agreed that the stockholders thus preferred should retire from the board of directors and should no longer have any voice in the management of the company, either as directors or by virtue of their ownership of the stock thus preferred. Whether this part of the plan was embodied in a formal resolution does not clearly appear, the minute-book then in use having been lost. It was proven beyond dispute, however, that after May 18th, 1893, neither Murphy nor McGill acted at any time as a director. Their stock was purchased by John M. Carroll, Fries and Breslin in the latter part of 1894, or early part of 1895; John M. Carroll taking from Murphy his one hundred shares and Fries and Breslin each taking twenty-five shares of the fifty shares that McGill held. James G. Carroll did not act as director after May 18th, 1893, until some time in 1899, at which time, in order to qualify him as a director, John M. Carroll transferred to him one share of common stock that the latter acquired after his own original stock had been converted into "preferred stock."

On May 18th, 1893, and after the three hundred and fifty shares had been converted into "preferred stock," proceedings were taken to increase the capital stock of the company from $50,000 to $75,000, by the issuance of two hundred and fifty shares of common stock. Of the new issue, John M. Carroll took two hundred shares, Fries and Breslin each twenty-five.

At this point, therefore, assuming the validity of the proceedings to create preferred stock, the *status* was as follows:

|  | Preferred Shares. | Common Shares. |
|---|---|---|
| John M. Carroll | 100 | 200 |
| Fries | . . . | 100 |
| Breslin | . . . | 100 |
| McGill | 50 | . . . |
| Murphy | 100 | . . . |
| James G. Carroll | 100 | . . . |
|  | 350 | 400 |

From the time when Murphy and McGill sold their holdings until the date, in 1899, when John M. Carroll transferred one share of common stock to James, the holdings were as follows:

|  | Preferred Shares. | Common Shares. |
|---|---|---|
| John M. Carroll | 200 | 200 |
| Fries | 25 | 100 |
| Breslin | 25 | 100 |
| James G. Carroll | 100 | . . . |
|  | 350 | 400 |

The first point made in behalf of the plaintiff in error in this court challenges the legal validity of the items credited to the plaintiff for profits in the years 1894, 1896, 1897 and 1898, on the ground that such profits were not legally declared as dividends to the plaintiff. The item credited to the plaintiff under date of April 25th, 1893, is not disputed here—perhaps for the reason that if the later credits can be sustained upon any ground, the credit item of 1893 must be sustained likewise.

The statutory provisions as to declarations of dividends, in force during the period in controversy, are as follows: By section 52 of the general "Act concerning corporations," approved April 7th, 1875, as amended by supplement of March 17th, 1891 (*Pamph. L., p. 176; Gen. Stat., p. 955, § 227*),

all manufacturing companies were required, on the 1st day of August in each year, unless some other specific day for the purpose were fixed in the charter or by-laws, and in that case then on the day so fixed, after reserving over and above the capital stock paid in, as a working capital for said corporation, a sum to be specified by the board of directors, not exceeding one-half of the capital, to declare a dividend of the whole of their accumulated profits exceeding the amount so reserved as a working capital, and pass a share or dividend of each stockholder of such profits to the crédit of the respective stockholders, and pay the same to the stockholders on demand.    By a supplement approved April 5th, 1876 (*Pamph. L., p.* 74; *Gen. Stat., p.* 928, § 106), companies were authorized to change the time for declaring dividends, by a vote of two-thirds in interest of the stockholders, at any regular meeting of the stockholders.    By section 7 of the general act of 1875 (*Gen. Stat., p.* 911), the directors were prohibited from declaring dividends except from the surplus or profits.    Corresponding provisions (differing, however, in some details), effective after July 4th, 1896, are found in the revised "Act concerning corporations," passed in that year.    *Pamph. L., p.* 277, §§ 30, 47.    The present controversy antedates the amendment of section 47, enacted in 1901.    *Pamph. L., p.* 245.

In the case at hand, none of the sums claimed as dividends was declared on the date prescribed by the act in force at the time.    The evidence introduced in behalf of the plaintiff below tended to show that during the period covered by the disputed items John M. Carroll, Fries and Breslin alone acted as directors; that they were all personally active in the management and conduct of the company's business; that they were frequently in attendance at the place of business of the company, and were in close touch with all its affairs; that twice each year an inventory was taken, an account made up and a balance struck, for the purpose of ascertaining whether the company had made a profit or a loss, and determining the amount of the profits when made;

that the results were submitted by the bookkeeper to Fries, Breslin and John M. Carroll, all of whom were personally present on each occasion; that the amount of profit shown by the balancing of the books was considered by them; that various items were charged off and the balance was handed by them to the bookkeeper to be credited up as profits; that in crediting the profits, the so-called preferred stockholders were first credited with amounts equal to fifteen per centum per annum of the face value of their stock and the balance of the ascertained profits was credited up in equal thirds to the individual accounts of John M. Carroll, Breslin and Fries. There was abundant evidence to show that this was done on each occasion with the full knowledge of each of the parties just mentioned, and that all of them had access to the books and frequently consulted them. The credit balances of the several stockholders were drawn upon by them individually from time to time.

No minutes were kept of any of the meetings of directors at which this business was transacted; no formal resolution was at any time passed. John M. Carroll, Fries and Breslin acted in the matter without notifying either of the other three stockholders. As the latter had not at any time formally resigned as directors, the validity of the dividends must depend either upon the ground that the agreement made when the preferred stock was created amounted to a resignation and was accepted as such, or upon the ground that the evidence, aside from that, warranted the jury in finding that James G. Carroll, Murphy and McGill had by their abstinence consented that John M. Carroll, Fries and Breslin should alone act as *de facto* directors.

In our opinion there was sufficient evidence to support the finding of the jury upon either of these grounds.

To sum up, the jury was justified, by the evidence, in finding, and from the mode in which the case was submitted to them and the verdict that they rendered we must assume that they did find, that the issuance of preferred stock was assented to by all the stockholders and included an agreement

that the preferred stockholders should retire from participation in the management; that, pursuant to this agreement, they did retire, and that the board of directors was thereby reduced to three; that the three directors, during the period in question, acted unanimously and with the acquiescence of all the stockholders in ascertaining the profits at stated times, in determining what amount should be reserved as working capital and in setting apart the residue of the profits for distribution among the stockholders; that in such distribution preferred stockholders were first paid or credited amounts aggregating fifteen per centum per annum upon their stock and the residue was divided among the common stockholders, not *pro rata,* according to their holdings, but in a manner satisfactory to them and acquiesced in by all the stockholders; that the plaintiff's share of the profits, according to this distribution, was on each occasion credited to him upon the books by the agents of the company, acting under the direction of the board of directors; and that the sums thus apportioned to the plaintiff, less deductions for moneys paid him on account thereof and other debits against the account, were carried to the credit of the plaintiff upon the company's own books during a course of years with the knowledge of all the directors and the tacit assent of all the stockholders. Plaintiff, meanwhile, had been led to deal with this credit on the books as evidence of an indebtedness owing by the company to him, and the other stockholders similarly credited had done the same. In view of these facts it seems to us that the corporation, as well as its stockholders, is now estopped from setting up that the plaintiff is not entitled to the moneys standing to his credit.

In order to arrive at this result we must, of course, hold that unanimous consent and acquiescence of the stockholders, acted on by the parties concerned to such extent as to materially change their position, preclude the assenting stockholders as individuals and the corporation as such from afterwards setting up legal informalities in matters of internal concern that effect only the interests of the stockholders to the overthrow of rights that have been acquired

on the faith of the consent and acquiescence. In the present case we apply this doctrine to the non-observance of legal forms respecting the creation of preferred stock, the abandonment by preferred stockholders of voting powers, the resignation of directors, the reduction of the number of directors from six to three and the apportionment of dividends as between the stockholders entitled thereto. In respect to these matters the jury was fully justified in finding that unanimous consent of the stockholders of the defendant company had been given and had been acted on in good faith by the plaintiff and others concerned during a course of years, and that plaintiff could not be restored to the *status quo ante* were the assent of his fellow-stockholders and of the company to be now withdrawn.

In the eye of the *law* corporations are entities separate and distinct from their constituent members and not bound by the individual acts of the latter. The *law* deals with the corporation as an artificial person. *Equity* realizes that this legal entity is but a legal fiction; looking through the form it discerns the substance. It finds that a stock corporation is in essence an aggregation of individuals, a statutory partnership with assignable membership and limited liability of the members, and so the doctrine of equitable estoppel applies fully to all the internal concerns of stock companies. Saving so far as public policy and the interests of creditors and other third parties are concerned (none of which is involved in the present case), the stockholders may bind themselves *inter sese* and in favor of the corporation by their own acts and agreements, and what will bind *all* the stockholders, with respect to an obligation from the company to one of its members, will bind the company as such.

The authorities to this effect are abundant. Mr. Thompson, in his new work on *Corporations*, lays it down "that the body of stockholders are in substance the corporation, that estoppels are concurrent as between the stockholders and the corporation; in other words, that whatever will estop the stockholders will estop the corporation, and whatever

will estop the corporation will estop the stockholders." 4 *Thomp. Corp.*, § 5269. And again, at section 5314, he says: "The body of stockholders, in every business corporation, are *the persons who are incorporated.* They are, in a substantial sense, *the corporation.* They are the ultimate constituency and the directors who are elected by them from their own number are their officers. The ideal body is, in theory of law, the principal and the board of directors are the managing agents; but, in theory of equity, the body of stockholders are the beneficiaries in a trust and the directors are their trustees. It follows that many acts which the directors may do outside the scope of their powers become ratified and validated by the *acquiescence of the body of shareholders,* and, in general, the body of shareholders can ratify and confirm any act done by the directors or other officers of the corporation without a precedent authorization which the shareholders could have authorized originally." See, also, 4 *Thomp. Corp.*, §§ 4496, 4497.

It has been held by the Supreme Court of the United States that where persons accept preferred stock that has been illegally issued, and receive interest upon it for several years, they and their assigns thereby become estopped from questioning the power of the corporation to issue it. *Branch* v. *Jessup,* 106 *U. S.* 468; 2 *Thomp. Corp.*, § 2254. See, also, *McGregor* v. *Home Insurance Co.,* 6 *Stew. Eq.* 181, 183.

In *Kent* v. *Quicksilver Mining Co.,* 78 *N. Y.* 159, it was held that corporate acts not *per se* illegal, but which are *ultra vires,* affecting, however, only the interests of the stockholders, may be made good by the assent of the stockholders.

In *Allen* v. *Wilson,* 28 *Fed. Rep.* 677, it was held by Judge Gresham that a stockholder is estopped to object to corporate acts which were performed with his knowledge and assent, and that such assent might be implied from his long silence.

In *Wood* v. *Boney,* 21 *Atl. Rep.* 574 (at *p.* 585), it was held by Vice Chancellor Bird that a stockholder could not object to the holding of a directors' meeting outside of the state,

when he had acquiesced in the practice for a long time without objection.

In *Rabe* v. *Dunlap, 6 Dick. Ch. Rep.* 41, Vice-Chancellor Van Fleet held that a non-assenting stockholder, desiring to obtain an injunction to restrain an unauthorized consolidation of corporations, must act promptly, before the act of which he complains has become the foundation of rights or equities that must be destroyed or greatly impaired if the act be nullified or undone.

In the case of the *Griffing Iron Company, 34 Vroom* 168, 357, the Supreme Court affirmed an election of directors had at a special meeting, held without due notice, on the ground that every share of stock was represented at the meeting and a majority, both in number and in interest, of all the stockholders voted for the directors whose title was assailed. This court, on review, affirmed the judgment.

Although estoppels be based upon equitable considerations, they are none the less available in the courts of law. *Martinez* v. *Runkle,* 28 *Vroom* 111; *Gibbs* v. *Craig,* 29 *Id.* 661; *Central Railroad Co.* v. *MacCartney,* 39 *Id.* 165 (at *p.* 175); *Drexel* v. *Berney,* 122 *U. S.* 241, 253; *Fowler* v. *Parsons,* 143 *Mass.* 401, 406.

We are therefore of the opinion that those exceptions which challenge the plaintiff's right of recovery on the ground that there was no evidence from which the jury had a right to find the plaintiff entitled to the dividends in question, cannot be sustained.

Sundry exceptions raise questions concerning the instructions given to the jury as to the mode in which the profits were ascertained by the directors and set apart for division among the stockholders, and to the method of apportionment that was pursued. They are, in the main, disposed of by what has already been said.

The learned trial justice instructed the jury, in substance, that the ascertainment of the profits and the determination as to what part of the profits thus ascertained was to be set apart and divided among the stockholders, were functions

that the directors alone could perform; that neither of these things could be done by the stockholders. He further charged that while the forms prescribed by law as to the time, place and manner of declaring dividends were very proper to be followed, in order for the avoidance of disputes, the forms were not essential so long as the directors did the substance of what the law requires of them. That whenever the corporation, through its directors, declares that the ascertained profits, or any part of them, shall cease to be the profits of the company and shall become the profits of the stockholders, at that moment they become in law the property of the stockholders, and the corporation thereafter does not own them. Whether in fact the directors of the defendant company did, at the several times in question, separate from what belonged to the corporation a certain portion of the earnings to become a dividend which the stockholders were to have, was submitted as a question of fact to the jury.

There was no evidence to show that during the period covered by the controversy the ascertainment of the profits, and the decision as to what portion was to be distributed, were reached by unanimous action or concurrence of the stockholders. The judge, therefore, properly charged that with respect to these matters the case turned upon the question whether, in fact, the directors had performed their appropriate functions.

The trial justice further charged the jury, in effect, that whenever the directors set apart a portion of the profits of the company for division among the stockholders, it is their *prima facie* duty to apportion the dividend among the stockholders *pro rata* to their several holdings; but that if all the stockholders who are entitled to participate in the division authorize, ratify or acquiesce in any distribution of the fund among themselves, differing from the ordinary *pro rata* division, the directors may make the division in accordance with such authorization, ratification or acquiescence of all the stockholders. He left it to the jury to say, upon the evidence, whether the division actually made of the profits as between

the stockholders in the case at hand was authorized, ratified or acquiesced in by the holders of all the stock.

In illustrating the applicancy of these instructions to the testimony in the case, the trial judge directed the attention of the jury to the period during which there were only four stockholders, viz., John M. Carroll, Fries, Breslin and James G. Carroll. As to the former three, who were during that time acting as directors, and as such participating in the ascertainment and division of profits in the manner above mentioned, the trial judge properly charged that they must be presumed to have approved of the proceedings. As to the remaining stockholder, James G. Carroll, it was left to the jury to say whether he was an acting director or whether, under the testimony, he should be presumed to have ceased to be such upon his acceptance of his preferred stock and the fifteen per cent. dividends thereon. The whole question was submitted to the jury on the theory that so long as the directors ascertained the profits and set apart the portion thereof that was to be divided, all matters of form were immaterial, and the actual division of the declared dividends among the stockholders was a matter that could be settled by agreement among themselves, evidenced by their acquiescence in the course of procedure that was followed. These instructions were fully warranted by the evidence, and in our opinion they embody no error in law—at least none detrimental to the interests of the defendant.

In our view, the purpose of the statute in prescribing that at a fixed time each year the directors shall make and declare dividends out of the profits, is to safeguard the right of the stockholders to have a just participation in the gains of the company. The statute does not invalidate dividends declared at other times, provided they be declared out of the actual profits.

The proofs in the case show that at stated times the specific things necessary to warrant a declaration of dividends were done, and that a certain portion of the profits actually made were set apart for distribution among the stockholders. This

is the essence of the declaration of a dividend, so far as it results in segregating a portion of the property of the company for the use of the stockholders. Thenceforward the corporation, as such, has no property interest in the moneys thus set apart. It is true that the directors are trustees for the several stockholders, charged with the duty of properly apportioning among them the moneys thus set apart for their use. And so the judge charged the jury. But it cannot be doubted that the stockholders may, by unanimous consent, adopt and become bound by a different mode of division.

The next ground relied upon for reversal is that, assuming that the profits in question were duly declared as dividends in favor of the plaintiff, he could not maintain an action for them without proof of a demand made upon the company for their payment and a refusal to pay them. As the trial judge instructed the jury, in substance, that the company was not compelled to pay until there had been a demand made, such as to indicate that the plaintiff desired to have his share of the profits paid over to him, the record raises only the question whether there was any evidence to justify the jury in finding that there had been a demand and refusal before suit brought. It appeared that a representative of the plaintiff wrote to the company, saying: "Mr. Thomas J. Breslin has authorized me to demand the amount due him from your company, and, in case of your refusal, to take proceedings to recover the same. The demand is hereby made, and unless I hear from you this week I shall consider the demand refused." An equivocal reply, in writing, was made by the company through its counsel. The argument is that since the plaintiff's demand did not mention dividends, it was not sufficiently specific. The trial judge, in substance, instructed the jury to consider the letter and its response, and also the nature of the entries upon the books, and determine whether they constituted a recognition by the defendant of the plaintiff's right to recover the balance therein stated, so that the subsequent refusal to pay the balance constituted a refusal of a demand for payment of the profits. As the dividends

had been entered up to the credit of the plaintiff in an account current kept upon the books of the company, and as the plaintiff's right was, not to have the whole of the dividends, but only such balance thereof as remained after debiting the items charged against him on the books, we think the instruction of the trial judge upon this point was correct.

The defendant requested the judge to charge the jury that the plaintiff was not entitled to recover interest on the profit items prior to the making of the demand thus mentioned. But as the books showed that during a course of years the interest had been credited up by the company upon the balances due to the plaintiff upon the books, the judge properly instructed the jury that it was for them to determine whether there was an implied agreement on the part of the corporation to pay interest, evidenced by its course of bookkeeping.

The judge was asked to charge that the plaintiff could not recover any claim for money that became due more than six years prior to the commencement of the suit. In response to this request he charged that in a running account, such as this, the strict rule of the statute of limitations is not applicable. There were items on both sides of the account within the six years. And as the account was kept by the defendant, the plaintiff being credited on its books from time to time with the balance remaining due to him, the defendant was not entitled to the instruction thus asked.

The judgment under review should be affirmed.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, GARRETSON, HENDRICKSON, PITNEY, SWAYZE, BOGERT, VROOM, GREEN, GRAY. 10.

*For reversal*—DIXON, VREDENBURGH. 2.