## Fidelity & Columbia Trust Co. et al. v. Louisville Ry. Co. et al.

(Decided Oct. 30, 1936.)

THOMAS J. WOOD and TRABUE, DOOLAN, HELM & HELM for appellants Fidelity & Columbia Trust Co. and Almstedt.

SQUIRE R. OGDEN and GORDON, LAURENT, OGDEN & GALPHIN for appellants Louisville Trust Co., Trustee, and Smith.

CHARLES P. FARNSLEY for Louisville Trust Co., Trustee, and Heflin.

JOHN E. TARRANT and BRUCE & BULLITT for appellees.

OPINION OF THE COURT BY JUDGE STITES—Reversing.

This is an appeal from a judgment of the Jefferson circuit court in a proceeding brought under the Declaratory Judgment Act (Civil Code of Practice, sec. 639a-1 et seq.). The Louisville Railway Company (hereinafter called the Railway Company), a corporation, has outstanding the following bonded indebtedness:

First Mortgage Bonds, dated July 1, 1890, due July 1, 1930 (extended to January 1, 1940) ................$1,700,000.00
Second Mortgage Bonds, dated March 1, 1900, due March 1, 1940 ........................................ 2,000.000.00
General Mortgage Bonds, dated February 1, 1910, due February 1, 1950 .................................. 4,035,000.00

$7,735,000.00

Under the indenture securing the first mortgage bonds, there was placed in lien all of the street railways in the amount of 128 miles of double and single track, "and also all of the street railway cars, wagons, and other vehicles, and all horses and mules, and all the tools, implement, and material, and all the forage and supplies owned by the said Louisville Railway Company, *together with all the rights, privileges, and franchises and immunities now owned or to be hereafter acquired* by the said Louisville Railway Company, together with all railway tracks, cars, equipment, supplies, materials to be hereafter acquired for use in the operation of the said railway, and all real estate in the said city of Louisville or county of Jefferson, owned or to be hereafter acquired by the said Railway Company, and all the stables, carhouses, shops and other structures owned or to be acquired by the said Railway Company."

The same property, in practically the same language, was put under a second lien to secure the second mortgage bonds. In 1903 the Railway Company organized a separate corporation known as the Louisville & Interurban Railroad Company (hereinafter called the Interurban), in which it, the Railway Company, owned all of the capital stock with the exception of qualifying shares for the directors—all of the directors of the Interurban being likewise directors of the Railway Company. The capital stock of the Interurban was $4,000,-000, divided into 40,000 shares of the par value of $100 each. In 1910, when the general mortgage bonds were issued, a third lien was placed on the property described in the indentures covering the first and second issues, and in addition the capital stock of the Interurban was expressly pledged to secure the payment of the general mortgage bonds.

The Interurban operated at a profit for many years, but with the advent of other means of transportation its earnings began to diminish, and it was deemed wise in 1931 to commence dropping certain of its lines which had become unprofitable, and finally its last line was discontinued in 1935, and it has entered into an era of liquidation and sale of all of its property and equipment. The assets remaining in the hands of the Interurban are:

Second Mortgage Bonds of the Railway Company, of the
Par Value of .....................................$ 171,000.00

General Mortgage Bonds of the Par Value of .......... 410,000.00
Cash ................................................. 285,250.80
Real Estate and other Assets ........................ 1,067,346.31

    Total ...........................................$1,933,597.11

The general mortgage bonds of the railway company are not callable, and the problem is presented of what disposition should or can be made of the assets of the Interurban which will be to the interest of all concerned in the unforeseen situation which has presented itself.

In the petition filed by the Railway Company and the Interurban, the trustees under the first, second, and general mortgages, together with an individual bondholder of each class, were named as defendants, and a declaration of rights on the following points was asked as to whether or not:

"I. The Railway Company can properly cause the Interurban to transfer to the Railway Company [a] the Interurban's 171 Second Mortgage Bonds to be delivered by the Railway Company to the Second Mortgage Trustee and by the Second Mortgage Trustee cancelled and retired, and [b] the Interurban's Two Hundred Eighty-five Thousand Two Hundred Fifty Dollars and Eighty Cents [$285,-250.80] in cash to be delivered by the Railway Company to the First Mortgage Trustee and used by the First Mortgage Trustee in calling and retiring First Mortgage Bonds.

"II. If the Interurban's Two Hundred Eighty-five Thousand Two Hundred Fifty Dollars and Eighty Cents [$285,250.80] in cash, upon the dissolution of the Interurban, must be and is transferred to the General Mortgage Trustee as additional security for the payment of General Mortgage Bonds, [a] the General Mortgage Trustee, with the consent of the Railway Company, may pay said Two Hundred Eighty-five Thousand Two Hundred Fifty Dollars and Eighty Cents [$285,250.80] cash to the First Mortgage Trustee on November 1, 1936, or May 1, 1937, with directions to call 285 First Mortgage Bonds and deliver them to the General Mortgage Trustee as outstanding First Mortgage Bonds of the Railway Company, [b] the First Mortgage Trustee may properly so call and deliver 285 First

Mortgage Bonds to the General Mortgage Trustee, and [c] when so called and delivered said 285 First Mortgage Bonds will remain outstanding and entitled to share in the security of the First Mortgage as fully as any other First Mortgage Bonds.

"III. If upon the dissolution of the Interurban its Two Hundred Eighty-five Thousand Two Hundred Fifty Dollars and Eighty Cents [$285,-250.80] in cash must be and is transferred to the General Mortgage Trustee, the General Mortgage Trustee may invest said $285,250.80 in any securities eligible for trust fund investments and including particularly First Mortgage Bonds, Second Mortgage Bonds, General Mortgage Bonds and hereafter issued notes of the Railway Company which are secured by a first lien on any equipment the Railway Company may hereafter purchase.

"IV. The General Mortgage Trustee may properly retire and cancel the 410 General Mortgage Bonds of the Interurban when transferred to the General Mortgage Trustee.

"V. The Railway Company may cause the Interurban to and the Interurban may, pursuant to the terms and provisions of the Railway Company's mortgages, convey its property and transfer its assets to the Railway Company so as to create under the terms of the First Mortgage, the Second Mortgage and the General Mortgage a first lien on said property and assets in favor of the General Mortgage Trustee as additional security for the payment of the General Mortgage Bonds in accordance with the terms of the General Mortgage.

"VI. The disposition of the Interurban's assets in accordance with the resolutions of the Railway Company and the Interurban which are hereinbefore set forth will comply fully with the terms of the Railway Company's mortgages which are hereinbefore set forth.

"VII. Prior to any default by the Railway Company in the payment of the principal or interest of the General Mortgage Bonds or the performance of any of its other obligations under the General Mortgage the General Mortgage Trustee may, when and as realized, pay over to the Railway

Company the income from any property delivered to it as security for payment of the General Mortgage Bonds.''

Since the points raised in the petition substantially cover the specific contentions advanced in the various answers, counterclaims, and cross-petitions, a consideration of these matters will be taken up in the order stated above without further reference to the particular contentions urged by the various defendants.

The case was submitted on the pleadings, and there is no disagreement as to the facts.

It is provided in the indenture securing the general mortgage bonds that ''the Railway Company shall be entitled to receive *all dividends* declared upon the stock of the Company and *all earnings* of said Company, and may for such purpose *commingle the earnings of the Interurban Company with its own earnings.''* The directors of the Interurban passed a resolution in 1925, which was spread at large on the minutes and has never been rescinded, to the effect that ''the payment of net earnings of this Company to the Louisville Railway Company in advance of formal declaration of dividends is hereby approved, and such payments in the future, at the discretion of the officers, is duly authorized.''

The capital of the Interurban became impaired in May, 1931, through the abandonment of the first of its Interurban lines which were discontinued.

Between January 1, 1922, and February 28, 1931, the Interurban had net earnings of $847,450.97, of which $389,282.28 was paid to the Railway Company in cash and the balance of $458,168.69 was entered on the Interurban's books as an indebtedness to the Railway Company on account of earnings of the Interurban which had not been paid to the Railway Company, and on the books of the Railway Company as a debt due to it from the Interurban.

At the end of each calendar year from 1925 to 1930, inclusive, the officers of the Interurban, in accordance with the above-quoted resolution, entered on the books of the Interurban as a debt to the Railway Company the amount by which the net earnings of the Interurban exceeded the cash dividend payment to the Railway Company during that year, and as of February 28, 1931, the

books of the Interurban and the books of the Railway Company on that account showed an indebtedness from the Interurban to the Railway Company in the sum of $458,168.69, and no part of that sum has ever been paid. It will be observed that none of this $458,168.69 informally set up as a dividend account and debt from the Interurban to the Railway Company was created after the capital stock of the Interurban is shown to have become impaired. The Railway Company does not claim that it is entitled to any of the net earnings of the Interurban accruing after May, 1931. We are confronted, therefore, with the question whether or not the debit in the amount of $458,168.69 set up on the books of the Interurban by its officers pursuant to the resolution of 1925 was such a declaration of a dividend as may now be considered to create a debt from the Interurban to the Railway Company in that amount.

It is well settled that the declaration of a dividend creates a debt from the corporation to its stockholders which they may enforce as general creditors even in the event of the subsequent insolvency of the corporation. Winchester & Lexington Turnpike Co. v. Wickliffe's Adm'r, 100 Ky. 531, 38 S. W. 866, 18 Ky. Law Rep. 964, 66 Am. St. Rep. 356; Thompson on Corporations (3d Ed.) sec. 5308; Fletcher, Cyclopedia Corporations (pp. 6065, 6066); Cook on Corporations (8th Ed.) vol. 2, sec. 541. If, therefore, the action of the officers of the Interurban in setting up the obligation to the Railway Company on their books was in fact the declaration of a dividend, it follows that a debtor-creditor relationship was created and that the Railway Company is correct in its contention in this particular. Where, as here, the stock of the corporation is closely held and its management is substantially in the hands of its stockholders, the authorities have frequently recognized and sustained the informal setting apart of corporate profits or the informal division of net earnings as the declaration of a dividend. In Breslin v. Fries-Breslin Co., 70 N. J. Law, 274, 58 A. 313, 318, a stockholder in a closely held corporation instituted an action to recover from the corporation certain sums which had been credited to his account on the books without a formal declaration of dividends. It was shown that the practice followed was for the bookkeeper to report the net profits of the corporation to the directors, and, with their knowledge and acquiescence, each stockholder's pro rata portion of the

profits was then credited to him on the books of the company. In holding that this practice amounted to a declaration of dividends and that the amounts appearing on the books constituted an enforceable debt against the corporation, the Court of Errors and Appeals of New Jersey, speaking through Judge Pitney (later Mr. Justice Pitney of the Supreme Court of the United States), said:

> "The whole question was submitted to the jury on the theory that, so long as the directors ascertained the profits, and set apart the portion thereof that was to be divided, all matters of form were immaterial, and the actual division of the declared dividends among the stockholders was a matter that could be settled by agreement among themselves, evidenced by their acquiescence in the course of procedure that was followed. These instructions were fully warranted by the evidence, and, in our opinion, they embody no error in law—at least, none detrimental to the interests of the defendant. * * * The proofs in the case show that at stated times the specific things necessary to warrant a declaration of dividends were done, and that a certain portion of the profits actually made were set apart for distribution among the stockholders. This is the essence of the declaration of a dividend, so far as it results in segregating a portion of the property of the company for the use of the stockholders. Thenceforward the corporation, as such, has no property interest in the moneys thus set apart."

Obviously, only a creditor of the corporation could reasonably be injured by, or complain of, this informal procedure. See, also, M. Groh's Sons v. Groh, 80 App. Div. 85, 80 N. Y. S. 438; Spencer v. Lowe, 198 F. 961 (C. C. A. 8); Barnes v. Spencer & Barnes Co., 162 Mich. 509, 127 N. W. 752, 139 Am. St. Rep. 587; Fletcher Cyclopedia Corporations, secs. 3672, 3673; Cook on Corporation (8th Ed.) sec. 534, p. 1843; Thompson on Corporations (3d Ed.) sec. 5269. It is admitted in the case before us that there are no creditors of the Interurban other than the Railway Company. Certainly, the trustee under the general mortgage indenture and the bondholders which it represents cannot object in view of the provision quoted above under which the general mort-

gage bondholders expressly waived any right to receive dividends or earnings of the Interurban prior to a default in the payment of the general mortgage bonds. There has been no default. It follows that the contention of the Railway Company is sound in so far as it asks for the transfer to it of the cash and second mortgage bonds free of the lien of the general mortgage.

Our conclusion in this regard is fortified by the fact that the resolution providing for the transfer explicitly limits the rights of the Railway Company in dealing with the funds to canceling the second mortgage bonds and to paying over the cash received to the trustee under the first mortgage indenture for the purpose of calling and retiring first mortgage bonds. The necessary effect of this step is to increase the security back of the general mortgage bonds. Since no one can be hurt by the transaction and the persons vitally interested are benefited, through the increased security thus placed back of their bonds, it is difficult to see wherein any valid objection can be made to the procedure contemplated. It may be noted that the total bonded indebtedness of the Railway Company is but $7,735,000, while it is admitted in the record that a fair valuation of the properties securing these bonds is in excess of $16,000,000.

What we have said in regard to the first question submitted by the plaintiffs below renders it unnecessary for us to consider the propositions submitted under II and III, supra, other than will be necessary in considering certain portions of the judgment as applied to cash which may be received in the future from other sources than the specific sums here involved.

The next point necessary for our consideration is whether or not the general mortgage trustee may properly cancel and retire the 410 general mortgage bonds of the Interurban when transferred to it under the resolution of the directors referred to above. No objection is raised by any of the parties to the procedure suggested in this connection, and we have found no provision in the general mortgage indenture which would prohibit the arrangement suggested. On the contrary, it is expressly provided in the indenture that the proceeds from the sale of any of the railway property secured by the mortgage, no longer necessary for the operation of the railway, may be used in the purchase of

general mortgage bonds which, when so purchased, shall be forthwith canceled and delivered to the general mortgage trustee. Certainly, in view of this express provision, the procedure suggested as to these bonds is substantially, if not strictly, in compliance with the mortgage.

The next question presented concerns the right of the Railway Company and of the Interurban to transfer its remaining physical assets—all of the property remaining in its hands—to the Railway Company subject to a first lien held by the trustee under the general mortgage indenture so as to remain a primary security for the general mortgage bonds ahead of the first and second mortgage bonds. In this connection, it is contended on behalf of the trustees and holders of first and second mortgage bonds that the indentures securing those issues constituted a first and second lien, respectively, on the stock or assets of the Interurban. A reading of the first and second bond indentures, the relevant portion of which is quoted above, indicates very clearly that the after-acquired property thereby placed in lien must be limited under the rule of "ejusdem generis" to the specific kinds of property there mentioned, and that there is nothing in either mortgage which might be considered as placing in lien the after-acquired stock of the Interurban. We are further confident of our conclusion in this regard because of the fact that for over twenty years no question has been made, either by the trustees or bondholders under the first and second mortgage bond issues, of the validity of the pledge of the stock of the Interurban as security for the payment of the general bonds. No other objection to the proposed transfer of the physical assets from the Interurban to the Railway Company is urged, and it is expressly provided in the general mortgage indenture that "the Railway Company shall likewise have the power to convey any part or all of the property of the Interurban Company to the Railway Company, but shall, when doing this, provide by proper deed of further assurance for the inclusion of such property in the scope of this indenture."

What we have said in response to the previous questions disposes of the proposition presented under VI, supra. We find nothing in the procedure which it is proposed to follow which can in any way be said to conflict with the mortgages.

Finally, we are asked to consider what rights or what duties may rest on the general mortgage trustee in the disposal or investment of any funds which may in the future come into its hands. Clearly, what we have said in connection with the other questions presented demonstrates that there will be no income accruing to the general mortgage trustee from the property of the Interurban except, possibly, from the real estate conveyed direct to the Railway Company by it. The trial court, in considering this question, held that the general mortgage trustee might turn over any funds in its hands to the trustee under the first mortgage indenture with the direction that such funds be used in calling first mortgage bonds, and further that the first mortgage trustee could then be required to turn over such bonds to the general mortgage trustee *without cancellation,* to be held by it as a sort of sinking fund for the general mortgage bonds. Aside from the inherent inequity of such an arrangement, so far as first mortgage bondholders are concerned, it is expressly provided in the indenture giving the right to the trustee to call first mortgage bonds that any funds received by such trustee shall be used in "calling for payment" a portion of the outstanding first mortgage bonds. It is likewise provided that a sinking fund shall be established "for the purpose of paying and retiring" said bonds and that "in calling bonds for redemption" the trustee shall follow certain prescribed rules. Similarly, it is indorsed on each of the outstanding first mortgage bonds that "this bond may be called for payment and retired by the Louisville Railway Company on any interest-paying date in accordance with the terms and provisions of said supplemental mortgage." In Jones on Corporate Bonds and Mortgages (3d Ed.) sec. 326a, it is said:

> "Under an agreement for the making of a sinking fund and the retirement of certain bonds drawn by lot, the terms of the agreement must be strictly followed or the right to retire bonds will be lost. Each bond has an equity represented by the chance that it may not be drawn by lot for redemption until it becomes payable. As bonds may draw a high rate of interest, that equity is valuable, and each bondholder has a right to insist that his bond shall not be redeemed except in strict accordance with the contract contained in the mortgage.

Whatever the mortgagor has done outside of the contract, by way of paying or acquiring bonds cannot be considered as done under the contract or in any way credited upon the sinking fund clause. That clause cannot be enforced upon any basis less favorable to the outstanding bondholders than if the contract had been performed instead of violated.''

Reading all of these various provisions together, it cannot be doubted that, even if the general mortgage trustee should see fit to pay over funds in its hands to the first mortgage trustee for the purpose of calling bonds, the power of the first mortgage trustee is strictly limited by the terms of the indenture, as well as by the terms of the indorsement on the bonds themselves, to a calling for the purpose of retirement, and that such trustee is without power under the terms of the trust to keep called bonds alive. It has been held in various cases where a trustee or corporation is given the power to *purchase* outstanding bonds that in such a situation it is unnecessary that the bonds be canceled when they reach the hands of the trustee. Such in fact was the decision of this court in the case of Fidelity & Columbia Trust Co. v. Louisville Railway Co., 258 Ky. 817, 81 S. W. (2d) 896. In the case cited, the question presented was not one of *calling* by the trustee, but *purchase* of the bonds by the Railway Company. These are very different propositions, and the case is not therefore in point in the instant situation. The terms of the indenture and the indorsement on the bonds themselves are so clear that we have no hesitancy in concluding that it was not intended to give the trustee power to keep alive bonds which it had called under the provisions of the indenture. It follows that the decision of the trial court was to this extent erroneous.

The judgment is reversed, with directions to enter a judgment in conformity with this opinion.