## Fidelity & Columbia Trust Co. v. Schmidt et ux.

(Decided June 21, 1932.)

WILLIAM MARSHALL BULLITT, ROBERT LEE BLACKWELL, T. KENNEDY HELM, FURLONG & WOODBURY, GARNETT & VAN WINKLE, BEN F. WASHER, and DAVIS W. EDWARDS for appellants.

J. D. O'LEARY, CHARLES T. RAY, and GROVER G. SALES for appellees.

OPINION OF THE COURT BY JUDGE WILLIS—Affirming.

The questions raised by this record are difficult, some of them are new, and all of them are interesting and important. They grew out of the insolvency of the Louisville Title Company. The controversy revolves around the pivotal question whether the borrower or the bondholders must suffer the loss arising from the dissipation of payments made by the borrower to the

434

title company, trustee, as required by the contract. The bondholders claim to be bone fide purchasers for value without notice and before maturity of negotiable instruments, which status entitled them to collect the bonds and to enforce the security unaffected by the payments made by the borrower to the title company as trustee, even though such payments were made under and in accordance with the provisions of the trust mortgage. The borrower denies the negotiability of the bonds, and asserts the right to rely upon part performance of the contract by payments to the title company as constituting payment pro tanto of the bonds. The risk of loss resulting from the insolvency of the title company is attributed to the borrower or to the bondholder accordingly as the one or the other interpretation is put upon the documents and the acts of the parties involved in the transaction. The standpoint of the adversary parties shapes and colors the respective views taken of the transactions. The circuit court decided in favor of the borrower, and the bondholders have prosecuted the appeal. A cross-appeal has been taken by the borrower on a minor matter concerning an interest credit claimed by him.

The facts must be stated fully and with precision, in order to avoid a contracted view of the case. Elmer H. Schmidt made a written application, dated June 17, 1926, to the Louisville Title Company. The opening sentence of the application read:

> "The undersigned, hereinafter called the applicant, hereby applies to the Louisville Title Company for its deed of trust and bond sales services, covering a proposed issue of 6 per cent. coupon bonds, to be secured by mortgage deed of trust to the Louisville Title Company, as trustee, and agrees to pay therefor, on demand, the compensation and charges itemized on the reverse side hereof."

A number of statements and representations were made and a number of questions were answered in the application. Among the questions was: "For what purpose do you desire this loan?" It was answered, "To finance construction costs." It appears that Schmidt was erecting a residence and desired to borrow money to pay the contractor. The title company agreed, upon approval of application, to render certain specified services, among which was a specification in these terms:

"It binds itself to sell for the Applicant all of the bonds mentioned at not less than par and accrued interest, and to guarantee to the purchaser payment of said bonds and interest coupons thereto attached at their respective maturities, and after applying the proceeds of such sales to the liquidation of any existing liens of indebtedness against said property, will remit the balance, if any, to the Applicant or his order. Pending the sale of said bonds the Company will advance to the Applicant such sums as may represent the net proceeds of such sales when made as the Applicant may be entitled to and such bonds, when executed, shall be retained by the Company as security for the repayment to it of such advancements, together with six per cent interest thereon, and upon sale of said bonds it may reimburse itself for such advancements with interest."

The charges and expenses itemized on the application amounted to $179.50, including a fee of $114 for the services of the trustee.

The application contained a form for the report of appraisers, which was executed by a single appraiser on June 29, 1926. The loan was approved for $5,700, and soon thereafter a series of obligations were issued, each of which was entitled "First Mortgage Real Estate Gold Bond. Title insured and Payment of Principal and Interest guaranteed by Louisville Title Company." The bonds were lithographed in an attractive style, and the name of the title company appeared in distinctively large letters. Immediately below the title a promise to pay, in this typical form, was printed:

"Louisville, Kentucky
"July 16, 1926.

"One year after date, for value received, the undersigned will pay to the Louisville Title Company, Trustee, or bearer, Two Hundred Dollars, in gold coin of the United States of America, at the present standard of weight and fineness, with interest from date at the rate of six (6) per centum per annum, payable semi-annually, in gold as above, according to the coupons attached, and with interest after maturity until paid, at the rate of six (6) per centum per annum, payable in semi-annual installments in gold as above, negotiable and pay-

able at the office of the Louisville Title Company, Louisville, Kentucky.

"This bond is one of a series of ten bonds numbered from 1 to 10, inclusive, of the same date herewith, amounting in the aggregate to the sum of $5,700.00, executed and delivered by Elmer H. Schmidt, and secured by a Mortgage deed of trust to the Louisville Title Company, Trustee, recorded in the office of the Clerk of the County Court of Jefferson County, Kentucky. The covenants of said Mortgage deed of trust securing this Bond and its interest coupons are made a part hereof as if herein written in full.

"Elmer H. Schmidt."

The first three bonds were for $200 each, and matured in one, two, and three years from date. The fourth bond was for $500, and matured in four years. The next four bonds were for $1,000 each, and matured on July 14, 1931. The remaining two bonds for $300 each became due on July 14, 1931. The coupons attached corresponded with the terms of the bonds; each bond containing interest coupons sufficient to carry it to maturity, the amounts on all of them aggregating $1,572. On the back of each bond an indorsement appeared in this form:

"Certificate.

"This is one of the bonds mentioned in and secured by the within named Mortgage Deed of Trust, and subject to the conditions set forth on the reverse side of this bond, the payment of principal and interest thereon at maturity are guaranteed by

"Louisville Title Company.

"By ————, President."

The conditions set forth on the reverse side of the bond were:

"This bond is sold by the Louisville Title Company, with the agreements and subject to conditions as follows, to-wit:

"I. The Louisville Title Company guarantees payment to the holder of this bond and the coupons attached the amount thereof at their respective maturities in lawful money of the United States of America;

"Provided, that the same shall be presented at its office for payment at or within twelve days after maturity, and not otherwise. Upon making such payment said Company shall become the owner, as by purchase, of the Bond and coupons so paid.

"II. The Louisville Title Company guarantees to the holder of the within bond that the mortgage therein referred to is valid, and insures him against loss by reason of defects of title to, or encumbrances on the premises therein described at the time of recording said mortgage excepting, however, defects or encumbrances created by it with the privity of said holder; and said Company, at its own cost, will defend the validity and priority of lien of said mortgage; Provided, That said holder shall, within a reasonable time, not exceeding ten days after any service or process upon him, notify said Company thereof, in writing, and shall call upon said Company and give to it the exclusive right to prosecute or defend, as the case may be, any action or proceeding, wherein the validity or priority of said mortgage deed of trust, or the existence of such defects or encumbrances may be drawn in question to the prejudice of said bondholder. Provided further, That the refusal or failure of said bondholder so to notify or to call upon said Company and to give it the right so to prosecute or defend such actions, shall avoid the obligations imposed by this clause.

"III. In no event will the Louisville Title Company be liable for the fees of counsel, or other costs, incurred by the holder of said bond in the prosecution or defense of any of the actions or proceedings herein mentioned.

"IV. When this bond shall become due according to its tenor or payment thereof shall have been precipitated under the provisions of the mortgage deed of trust securing the same, of which precipitation notice shall have been given the holder thereof, it shall be the duty of said holder to present it for payment at the office of the Louisville Title Company, and if it shall not be so presented when due, or within ten days after such notice of maturity by precipitation, then the Louis-

ville Title Company as Trustee may receive payment thereof, holding the amount subject to the order of said holder, and may thereupon, in its own name as trustee, or in the name of said holder, release said mortgage. This power to the said Trustee is a part of the consideration of the sale by it of this bond, and is irrevocable without the written consent of said Trustee. In the event the said Trustee shall declare a precipitation of the maturity of this bond, and the holder shall surrender the same to said Trustee for payment, said Trustee shall refund to the holder a proportionate amount of the premium, if any, that may have been paid to it by said holder, for the unexpired time said bond would have had to run.

"V. If by agreement of the holder of the within bond the time of payment thereof shall be extended beyond its maturity without the consent of the Louisville Title Company all the obligations of this agreement shall cease, and the same shall be and become void.

"VI. The Trustee shall have the right to require the surrender and retirement of this bond for the purpose of permitting the payment of same before its maturity in which event the holder shall be entitled to receive therefor the amount of the principal with accrued interest, the return of the proportionate amount of premium, if any, that may have been paid for same, and an additional premium of one-half of one per cent of said principal.

"If said bond be not presented within ten days after notice of such election by the Trustee is given the holder, or within ten days after written notice of such election shall have been mailed to the last known address of said holder, said Trustee may receive payment of said bond, and make release thereof, as hereinabove provided. Provided that if said holder does not receive knowledge of notice of such election then he shall be entitled to receive interest on said bond until he receives such notice, not however longer than the next ensuing interest period."

Upon the same day, and coincidentally with the execution of the bonds and coupons, another instrument was executed by Schmidt, in which his wife joined, and

which was entitled "Sinking Fund Mortgage Deed of Trust." It was an ordinary real estate mortgage to the Louisville Title Company, trustee, "for the purpose of securing the payment of the principal and interest of the bonds," and "for the purpose of securing the fulfillment of all the covenants and conditions hereafter contained." The consideration was recited to be "the purchase of and payment for said bonds and coupons by the several bondholders who may purchase the same." The covenants and conditions referred to were:

"The Mortgagor, for himself, his representatives and assigns further covenants and agrees, until the terms of this mortgage shall be fully complied with:

"First: That he will pay the bonds and coupons hereby secured according to the terms thereof at their respective maturities and that in order to provide for the payment of same he will deposit with the Trustee at least three days in advance of the time when such coupons and bonds respectively mature, a sum of money in gold coin or its equivalent as hereinbefore provided sufficient to pay all of said maturing bonds and coupons.

"Second: That in addition to the covenants last above written and other covenants and undertakings of this instrument, and in order to create a fund to be applied on the indebtedness secured by this instrument and the interest on same, the Mortgagor will deposit with the Trustee monthly before the close of business on the even date of each month from this date until the maturity of said indebtedness the sum of $52.27.

"Third: To keep the improvements on the mortgaged premises insured in some Company or Companies to be approved by the Trustee, against loss by fire, in the sum of not less than $5700 and against loss by tornado in the sum of not less than $5700.00, or in the extent of the value of the improvements in either case, if required by the Trustee to cause the policy or policies therefor to be properly assigned to or made payable to the Trustee for the benefit of the holder or holders of the bonds and coupons aforesaid, as collateral security for their payment, the proceeds of such insurance

to be applied to their payment; and to deposit all such policies with the Trustee.

"Fourth: To pay promptly all taxes or assessments now or hereafter levied against said premises including assessments for construction or improvement of streets, sidewalks, alleys, fire hydrants and other public utilities, for which liens are created by law.

"Fifth: Should the Mortgagor fail to keep up such insurance or to keep the policy or policies therefor deposited with the Trustee, or to pay the cost thereof, or to pay such taxes and assessments, the Trustee or the holder of any bond hereby secured may effect and pay for such insurance or pay such taxes or assessment or may at its option pay the premiums due and unpaid on any insurance in force, whether procured by mortgagor or by the Trustee, and the money paid therefor by the Trustee or such bond holder shall be deemed a part of the principal of the debt hereby secured, and with interest at the rate of six percent per annum, payable semi-annually, shall be paid on demand by the Mortgagor to the person so paying the same.

"Sixth: Should the Mortgagor fail to pay such taxes or assessments when the same become due or fail on demand of the Trustee or the holder of any bond hereby secured, to comply with any stipulation or covenant of this mortgage deed of trust, or fail to pay any of said bonds when the same becomes due or any of said coupons within ten days after such coupons become due, or should the mortgagor transfer title to any of the property herein conveyed (except by last will or by operation of law) without the assent of the Trustee, then and in any of such cases the holder of such overdue bond or coupon, or of any other demand mentioned in said paragraph fifth, if he shall first surrender to the Trustee for that purpose all evidences of debt held by him hereunder, may require the Trustee to declare due all bonds, coupons, debts and demands hereby secured and to forthwith proceed to collect the same and enforce this mortgage deed of trust by suit or otherwise; and in any of such cases the Trustee may enter on the mortgaged premises, collect the rents and profits thereof, and after pay-

ing all expenses of such collection, and a reasonable compensation for itself, including fees paid to its attorneys in this behalf, shall apply the money collected to the pro rata satisfaction of the debts and demands hereby secured. Any action that may be required of the Trustee under this section may be taken by the Trustee without it being so required.

"Seventh: Should the Mortgagor pay the indebtedness and perform all the covenants and stipulations hereof, the Trustee shall cancel bonds and coupons hereby secured, and shall release this mortgage deed of trust on the request and at the cost of the mortgagor, and the production of such bonds and coupons by the mortgagor shall be a sufficient warranty to the Trustee for making such cancellation and release.

"Provided, however, any record release of this mortgage deed of trust by the Trustee, as a whole or in part, shall, as to subsequent purchasers and mortgagees for value, be conclusive evidence of its power and authority to make such release."

At the time the papers were executed by Schmidt, the charges and expenses were deducted and the balance of the loan was paid to him.

Schmidt performed the covenants and conditions of the contract, and made the monthly payments of $52.27 as required. Such payments by Schmidt aggregated $3,083.93. The first four bonds which matured in 1927, 1928, 1929, and 1930 and all the coupons thereon were paid by the title company from the monthly payments, and were canceled and returned to Schmidt. The six remaining bonds had been sold by the title company to the parties at the times and for the prices indicated below:

| Bond Nos. | Par Value | Bond Sold To | Date | Price to Produce |
|---|---|---|---|---|
| 5 | $1000.00 | Lee E. Cralle | 6-17-27 | 5-¾% |
| 6, 7, 8 | $3000.00 | Virginia Steber— 4922 Virginia Ave. St. Louis, Mo. | 1-20-27 | 6% |
| 9 | 300.00 | Ben Allen c-o R. M. Hughes Co. | 8-13-26 | 5-½% |
| 10 | 300.00 | John W. David—1374 Brook | 1-9-28 | 5-½% |

These unpaid bonds matured on July 14, 1931, at which times the Louisville Title Company was insolvent and in the hands of the receiver. Schmidt desired to pay the balance due on his bonds, and a controversy arose as to the amount of money required to discharge the debt. The monthly payments which Schmidt had made to the title company, and which had not been applied by it previously to the payment of bonds, amounted to $549.93. The title company had commingled the money paid to it with its private funds, and could not produce it for the bondholders. The question is whether the loss thus arising must be borne by Schmidt, or by the holders of the unpaid bonds. It had been the custom of the title company, but without any agreement to that effect, and without the knowledge of Schmidt, or of the bondholders, to credit interest on the monthly payments at the rate of 4 per cent. per annum. The books of the title company showed a credit of $82.78 to Schmidt from that source. The importance of the case lies in the fact that there are many others like it pending for determination by the receiver.

Judge Marshall, of the First chancery division, in an able opinion concurred in by Judge Allen, of the Second chancery division, held that the loss must be borne by the bondholders, because the borrower had paid the trustee at the time and in the manner provided by the contract, which constituted a payment pro tanto of the bonds, and discharged to that extent the mortgage indebtedness. The item of interest credited on Schmidt's account by the title company was not allowed as a credit on the balance due on the debt. The judgment is assailed on the grounds hereinbefore stated.

With the facts of the transaction and the documents employed to effectuate the purposes of the parties thus completely exhibited, we now address ourselves to an exposition of the law governing the situation resulting from the financial failure of the trustee.

The application is invoked as giving conclusive character to the relationship established between the borrower and title company, and as an estoppel to preclude him from maintaining a different position after inducing the title company to sell his notes to the public. The application, in some aspects, is equivocal and ambiguous. It first appears to create a relationship of principal and agent for the purpose of preparing

and selling the bonds. In other aspects it clearly contemplates the relation of borrower and lender, but with the implicit understanding that the lender would resell the securities. It is not necessary to determine the precise character of relationship established by the application, since it did not continue after the purpose of that initial relationship had been accomplished. It ended when a new relationship intervened. A new relationship began when the bonds and other instruments were executed, and the true character of the transaction must be determined from the later documents and subsequent events. Moreover, the application was not referred to in the bonds subsequently issued, or connected with them in any manner. The bondholders, so far as shown by the record, were not aware of the terms and purpose or even the existence of the application. It has no bearing on the interpretation of the bonds or mortgage. Its function was fully performed in advance of the execution of the bonds, and before the payment of any money to the applicant. Hence the application was not one of the documents that gave character to the transaction involved, or that could be considered as an estoppel to preclude Schmidt from asserting the truth about the matters that transpired thereafter.

The bonds held by the various purchasers, and which had been acquired from the trustee, must be looked to for the true character and legal consequences of the obligations. On the face of the bonds it appears that they were payable to the ''Louisville Title Company, Trustee, or Bearer.'' There was an explicit reference in the bonds to the recorded mortgage as security. But it did not stop there. The covenants of the mortgage deed of trust were made a part of the bond as if written therein in full. The effect was by reference literally to incorporate the covenants into the bonds. But even that was not all. Upon the reverse side of the bonds conditions were contained which made the Louisville Title Company the guarantor of the bond; gave it authority to precipitate the maturity of the bonds in accordance with the terms of the mortgage; required the holders of the bonds to present them at the Louisville Title Company upon notice of precipitation; and authorized the title company in some situations to accept payment of the bonds without surrendering them. Moreover, upon the bond itself was re-

served the right of the trustee to require the surrender and retirement thereof for the purpose of permitting payment before maturity. Other powers vested in the title company made it the dominant authority throughout the life of the bonds. Taking the bond by its four corners, and looking at its own terms, there is no escape from the conclusion that the mortgage must be consulted in order to determine the whole contract between the parties.

It is a rule of law that two or more written instruments between the same parties, executed simultaneously, referring to each other, and concerning a single transaction, must be construed together as constituting the contract between the parties. 18 C. J. 216; Sackett v. Maggard, 142 Ky. 500, 134 S. W. 888; Macpherson v. Bacon, 180 Ky. 773, 203 S. W. 744; Terrell v. Cheatham, 200 Ky. 667, 255 S. W. 262. That rule is definitely established as applicable to notes and bonds secured by a mortgage to which the notes or bonds refer. 41 C. J. 452; Paepcke v. Paine, 253 Mich. 636, 235 N. W. 871, 75 A. L. R. 1205; Brooke v. Struthers, 110 Mich. 562, 68 N. W. 272, 35 L. R. A. 536; McClelland v. Norfolk Southern R. Co., 110 N. Y. 469, 18 N. E. 237, 1 L. R. A. 299, 6 Am. St. Rep. 397; American Gas & V. Mach Co. v. Wood, 90 Me. 516, 38 A. 548, 43 L. R. A. 449; Zollman v. Jackson Trust & Savings Bank, 238 Ill. 290, 87 N. E. 297, 32 L. R. A. (N. S.) 858. The distinction drawn when the note is negotiable, and governed by the statute, while the mortgage constitutes a mere security which may be waived, and which is affected by a different law (Thorp v. Mindeman, 123 Wis. 149, 101 N. W. 417, 68 L. R. A. 146, 107 Am. St. Rep. 1003), does not militate against the soundness or the universality of the rule stated.

When the covenants of the mortgage are examined, it is found that the maker of the note is bound to pay to the trustee a fixed amount monthly, failure to pay which produces serious consequences. It precipitates the maturity of the bonds, authorizes the trustee to enforce the mortgage, and to collect the whole debt. When read in connection with the contract between the trustee and the holder printed on the bond, the power of the title company to enforce its will, both against the bondholders and the borrower, is apparent.

The relationship created between the borrower and

the title company was that of debtor and creditor, and the debt was to be paid to the title company in a particular manner, regardless of the use made of the bonds. The monthly payments were made a condition of the continuance of the loan. When the title company came to sell the securities, it did not surrender its control over the bonds, or over the collection and disbursement of the money. Certain specific powers were conferred upon the bondholders in certain situations, but every power that was vested in the bondholders to require action by the trustee was reserved to the trustee without request or authority from the bondholders. The bondholders at no time succeeded to the rights of the trustee until it had failed in the discharge of its duty. The documents constituted the trustee an agent for the bondholders for the purpose and with the authority to collect and to disburse the monthly payments, and conferred upon it full power to enforce the obligations. In such a situation there is no room for the contention that the bondholders can now enforce the contract contrary to its terms, or exact more than was given by the contract. The borrower has performed the contract in accordance with the terms of his obligation and the bondholders who acquired their rights from the trustee legally consented for the borrower to discharge his contract in the manner required by the mortgage. This conclusion is compelled by the plain language of the writings and by the undisputed facts of the transaction. The authorities, when rightly understood, are in complete accord with the result reached. King Cattle Co. v. Joseph, 158 Minn. 481, 198 N. W. 798, 199 N. W. 437; McLeod v. Despain, 49 Or. 536, 90 P. 492, 92 P. 1088, 19 L. R. A. (N. S.) 276, 124 Am. St. Rep. 1066; Lidgerwood v. Hale & Kilburn Corp. (D. C.) 47 F. (2d) 318.

Appellants correctly and clearly classify the authorities in point which fall into four groups. The first group contains the cases which involved documents with the characteristics of a bond, but showing on their face that the promise to pay was conditional. The second group of cases involved bonds containing a reference to deeds of trust "for a statement of the rights of the bondholders." In such cases the deeds must be examined to ascertain if anything is contained to affect the negotiability of the bond. In the third class of cases the bonds are made "subject to the terms" of

some other instrument; or the express terms of the bond state definitely the fact that the bond is subordinate to another instrument. In the three groups of cases just described the negotiability of the instrument is destroyed by the character of reference to collateral and connected writings. The fourth class of cases in which the negotiability of the securities is preserved embraces bonds that refer to other instruments merely as providing security, or as showing the origin of the transaction, or as stating the consideration for the instrument. 8 C. J. 125; Enoch v. Brandon, 249 N. Y. 263, 164 N. E. 45; Pæpcke v. Paine, 253 Mich. 636, 235 N. W. 871, 75 A. L. R. 1205; City National Bank v. Adams, 266 Mass. 239, 165 N. E. 470; Finley v. Smith, Banking Commissioner, 165 Ky. 445, 177 S. W. 262, L. R. A. 1915F, 777; West Banking Co. v. Gaunt, 150 Tenn. 74, 262 S. W. 38, 34 A. L. R. 862; McCarty v. Louisville Banking Co., 100 Ky. 4, 37 S. W. 144, 18 Ky. Law Rep. 569. In order to determine the class into which the bonds in the present case fall, it is necessary to refer to the bonds executed by Schmidt. They do not stop with a reference to the mortgage as security. They incorporated the covenants of the mortgage by express reference as if copied therein, and conferred upon the title company such dominant rights of control, precipitation, payment, and release as to destroy negotiability. We are unable to perceive how the intent to incorporate the covenants of the mortgage into the bonds could be more clearly, succinctly, or emphatically expressed. The buyers of the bond not only consented for the payments to be made to the trustee, but they consented for the trustee to retain control and to maintain the plenary power to enforce the payments.

Even if as much be conceded, it is still argued that the monthly deposits with the title company did not constitute a payment pro tanto of the bonds, but amounted merely to an additional security for the ultimate payment thereof. It is said that the second covenant in the deed of trust called merely for a deposit to be held at the risk of the depositor. But it was not a deposit that created the relation of debtor and creditor between the title company and the depositor. It was "to be applied on the indebtedness secured by this instrument and the interest" thereon.

The title passed to the title company, and the "depositor" could not reclaim or control it. His rights as

owner ceased, and the rights of the holders of the bonds accrued. The true relation of the title company to the money paid by the borrower was that of trustee for the benefit of the holders of the bonds. But for the failure of the trustee the soundness of this position would hardly be questioned. The case of Silver v. Park-Lex Holding Corp., 222 App. Div. 40, 225 N. Y. S. 394, is relied upon as an authority. In that case a provision of the trust mortgage "to secure prompt payment of the bonds and the semi-annual payments of the interest" required the borrower to pay monthly in advance to a corporation one-twelfth of the amount to be paid annually. The corporation was not the trustee in the bonds or the delegate of powers like those possessed by the trustee in the case at bar. The trustee in the bonds was an officer of the corporation, but, of course, the corporation was a distinct entity. It was held that the payments did not constitute a discharge of the debt pro tanto, but were merely additional security to bondholders in the hands of a third party designated by the terms of the agreement. The corporation to which the money was paid was not an agent to receive payment. The court refused to decide that the corporation was a trustee for the bondholders to receive additional security. It was pointed out that a resort to security did not discharge the debt, particularly when the security was not given to the trustee under the mortgage, but to a third party. Assuming, without deciding, that the conclusion of the court under the facts of that case was sound, it has no application to the present problem, because of the distinguishing facts and the divergent consequences thereof. Here the money was payable to the trustee, and the consequences of nonpayment affected, not only the borrower, but the bondholders as well. It enabled the trustee to exact full payment, to discharge the bonds, and to release the security. The fact that the title company credited interest on the monthly payments is wholly immaterial, since it was not a part of the contract, or an obligation thereof, and was purely voluntary. The money paid in monthly could be used at any time for the payments of bonds or coupons. That matter was in control of the trustees exclusively. If the title company for its own purposes chose to allow interest instead of calling bonds, it could not thereby affect the right either of the borrower or of the bondholders who were helpless to prevent it. Looking at the transaction as an entirety,

we see no escape from the conclusion that the title company was not in any sense an agent of the borrower in receiving the payments. It was either the bondholder or the representative of bondholders at all times, and all that it did, and everything that it was authorized to do, was on behalf of and for the benefit of the bondholders. The trustee represented the holders of the bonds, with ample authority to accept payment in accordance with the contract, and to release the lien created by the mortgage. The bonds were not negotiable instruments that had to be surrendered by the trustee in order to discharge the debtor or to release the lien on his land. Cf. City National Bank v. Adams, 266 Mass. 239, 165 N. E. 470, and Black v. Elkhorn Coal Corp., 233 Ky. 588, 26 S. W. (2d) 481. The acts of the trustee in diverting and dissipating the funds collected for the bondholders, resulting in a loss of the funds, was not a risk that was put on the borrower. The title company was the trustee, agent, and representative of the bondholders to receive payment of the debt in whole or in part, to perform the duties, and to discharge the responsibilities, defined by the contract. A loss resulting from the default of the trustee in any of those particulars must necessarily fall upon those for whose benefit it was acting, and authorized to act. The bondholders were bound by the contract to that extent.

Upon the cross-appeal it is insisted that the circuit court erred in not giving the borrower credit against the bonds for the amount of interest which the trustee had credited on the monthly payments. It was no part of the agreement that the borrower should receive interest. The bondholder did not consent to that credit. If the trustee exacted usury of the borrower, the latter would have a remedy against the usurer. But the consequences of that fact could not be visited on the bondholders who were not a party to the exaction and could not be made liable therefor. The question is not presented whether the borrower was subjected to usurious interest which would entitle him to a judgment against the title company. In view of the small amount involved and the insolvency of the trustee, his remedy may be illusory. But nevertheless the borrower has no right to demand that the bondholders should allow him credit for interest on his payments when it was no part of the contract with the title company, and neither expressly nor impliedly authorized by the bondholders.

It follows that the circuit court correctly disposed of the case.

The judgment is affirmed on the original and cross-appeal.

Whole court sitting, except Chief Justice Dietzman.

Richardson, J. (dissenting in part).

I concur thoroughly in the opinion, except my view is the monthly payments created a sinking fund or security, and the unexercised authority conferred on the trustee on which the opinion lays stress did not abrogate the status of such funds nor constitute a payment on the bonds in any sense, and the loss therefor should be borne by the borrower.