# Masonic Widows' and Orphans' Home and Infirmary et al. v. Title Insurance & Trust Co. et al.

(Decided March 24, 1933.)

(Chancery Branch, First Division).

GARNETT & VAN WINKLE, BRUCE & BULLITT, J. BLAKEY HELM, L. T. WOLFORD, TRABUE, DOOLAN, HELM & HELM, HOMER W. BATSON and BEN F. WASHER for appellants.

HUGH B. FLEECE and A. M. SEA, Jr., for appellees.

OPINION OF THE COURT BY JUDGE REES—Affirming in part and Reversing in part.

This appeal grows out of the insolvency of the Louisville Title Company, which was placed in the hands of a receiver on June 22, 1931. The title company made loans secured by mortgages on real estate, and sold to investors the bonds executed by the borrowers. The title company guaranteed these bonds. It issued two classes of bonds; direct mortgage bonds, and sinking fund bonds. At the time of the receivership there were outstanding in the hands of investors bonds of each class to the amount of about $7,000,000. In the case of the sinking fund bonds the borrower was permitted to make monthly payments of a stipulated amount in order to create a fund to be applied on the indebtedness secured by his mortgage. At the time the title company failed, the total amount of these monthly payments, which had been made by various borrowers and which had not been applied in payment of bonds or interest thereon, was about $1,100,000. These payments were mingled with the title company's own funds, and had been dissipated.

In Fidelity & Columbia Trust Company v. Schmidt, 245 Ky. 432, 53 S. W. (2d) 713, 718, we had before us the question as to who sustained this loss, the bondholders or the borrowers. It was held in that case that the title company was the trustee for the bondholders in receiving payments on the mortgage loans and applying them to the payment of the bonds and interest, and that the loss consequently fell on the bondholders. The manner in which the title company conducted its mortgage loan business is explained in detail in the opinion in that case.

The present appeal presents questions not considered in the Schmidt Case. The Fidelity & Columbia Trust Company, receiver of the Louisville Title Company, filed this action against the Masonic Widows' and Orphans' Home and Infirmary and Louise Conrad under the Declaratory Judgment Act (Civil Code of Practice, sec. 639a-1 et seq.), for a declaration of the rights of the parties. The Title Insurance & Trust Company has succeeded the Fidelity & Columbia Trust Company as receiver, and it filed an intervening petition. Martin Gatton and Nellie Gatton, his wife, and F. C. Kelly and Eulie Kelly, his wife, were made parties to the action.

The bonds involved on this appeal are known as the Gatton bonds, and were executed by Martin Gatton and wife on November 20, 1925. They executed 6 bonds for the principal sum of $500 each, with interest coupons attached. Bond No. 1 matured on November 20, 1927, bond No. 2 on November 20, 1929, bond No. 3 on November 20, 1931, bond No. 4 on November 20, 1933, and bonds Nos. 5 and 6 on November 20, 1935. Bonds 1 and 2 were paid at maturity and were canceled. The appellee Louise Conrad owns bond No. 3, and the appellant Masonic Widows' and Orphans' Home and Infirmary owns bonds 4, 5, and 6. The bonds are secured by a lien retained in a deed of trust by the terms of which the makers agreed to pay the bonds and the coupons thereto attached on their respective due dates, and there is a stipulation that the makers would provide the funds to liquidate the bonds and coupons when and as they became due by making 120 monthly payments of $35.16 each to the Louisville Title Company. On March 10, 1928, Gatton and wife conveyed the mortgaged property to F. C. Kelly, who assumed the indebtedness and agreed to pay the bonds outstanding.

At the time the Louisville Title Company closed, 68 payments of $35.16 each should have been made by the borrower, and the title company, after paying bonds 1 and 2 and the matured interest coupons on all the bonds would have had on hand $400.88. It actually had on hand, however, $998.60 resulting from Gatton and Kelly having made 85 payments of $35.16 each. A judgment was entered declaring the rights of the respective parties and the chancellor, Hon. John Marshall, Jr., in an exhaustive, well-reasoned and happily

expressed opinion, set forth his reasons for the conclusions reached.

The pleadings presented for solution controversies existing between the defendants F. C. Kelly and Eulie Kelly on one side, and defendants Masonic Widows' and Orphans' Home and Infirmary and Louise Conrad on the other, and also a controversy between defendants Masonic Widows' and Orphans' Home and Infirmary and Louise Conrad. The questions involved are intricate and complicated, and require the adoption of formulæ for administering the affairs of the defunct Louisville Title Company that will do justice to all parties concerned, and at the same time present a workable and feasible plan for its successor to follow in its effort to bring order out of the chaos and confusion resulting from the failure of the title company.

It appears that the title company followed no uniform plan in fixing the amount of the monthly payments to be made by the various borrowers. In some cases the amount fixed would exactly pay off the debt and interest at maturity; in other cases the aggregate sum of the monthly payments would be in excess of the amount necessary to pay off the principal and interest of the bonds; and in still other cases the aggregate amount of the monthly payments would be less than the amount necessary to liquidate the indebtedness. The instant case belongs to that class of cases in which the monthly payments would produce a sum greater than was necessary to pay off each bond with accrued interest as it matured. This is referred to in the record as the "loading" in the loan. To be specific, Gatton agreed to pay 120 monthly payments of $35.16, which would produce $4,219.20. The principal of the bonds and the interest coupons attached thereto amounted to $4,200, which was the amount the title company would have to pay to the bondholders. Thus it will be seen that the Gatton loan contains $19.20 of loading. One of the questions presented is, Shall the title company be treated as trustee for the bondholders of all money received from the borrower before it failed, or shall the excess portion of the payments referred to as loading be treated as belonging to the title company individually? If the title company is treated as trustee for the bondholders for the entire amount of the stipulated monthly payments, the loss of this excess, under the

ruling of the Schmidt Case, would fall on the bond-holders. On the other hand, if the excess constituting the loading belonged to the title company, the loss would fall on the borrower. A companion question to the one above is raised by reason of Gatton and Kelly having made payments in advance. As heretofore stated, the title company closed its doors on June 22, 1931. The sixty-eighth monthly payment was due on June 20, 1931, but Gatton and Kelly had made 85 payments to the title company; in other words the borrower had made 17 monthly payments amounting to $597.72 in advance.

The above questions state the principal controversies between the borrower and bondholders presented by this record. A controversy between the bondholders also is presented. When the title company closed its doors there were four of the Gatton bonds outstanding. One matured November 20, 1931, another November 20, 1933, and the remaining two, November 20, 1935. The bond with the November 20, 1931, maturity is held by the defendant Louise Conrad, and the last maturing bonds are held by the defendant Masonic Widows' and Orphans' Home and Infirmary. The Masonic Widows' and Orphans' Home and Infirmary contends that the loss must fall on the bond maturing next after the failure of the title company, since the company was acting as trustee only for the holder of that bond when it received the payments which were lost. The defendant Louise Conrad contends that the loss should be prorated among all the bonds regardless of their maturity.

The questions in controversy heretofore enumerated involve other questions of a minor nature, all of which were answered and disposed of by the chancellor in the judgment entered below. The conclusions reached by the chancellor upon the questions presented to him are summarized at the conclusion of his opinion, as follows:

(1) The title company received all sums paid to it by the borrowers as trustee for the bondholders, even though: (a) The 120 payments which the borrower was called on to make would produce more than was needed by the title company to discharge the bonds and coupons which the borrower originally executed. (b) The sum which had been paid to the title company by the

borrower prior to its closing on June 23, 1931, was in excess of the sum which would have been produced by the borrower's making only the payments called for by the mortgage during the period from its execution up to the closing of the title company.

(2) The sinking fund loss, or the amount which the borrower is entitled to treat as a credit against the balance of his debt, is to be computed by subtracting from the total amount of payments received by the title company the total amount of bonds and coupons paid off by it before it closed.

(3) All outstanding bonds must take their pro rata portion of this credit even though they are of different maturities.

(4) That credit is to be first applied to the payment of interest accruing between the last interest-paying date prior to the closing of the title company and the next interest-paying date after the closing of the title company; that is to say, the coupon attached to a bond which would fall due on the next interest-paying date after the title company closed is to be paid by a part of the credit in favor of a borrower resulting from the sinking fund loss.

(5) The balance of that credit is to be applied pro rata to each bond at its maturity.

(6) The coupons attached to each bond, except as indicated in 4, are to be paid in full.

(7) Where the balance of the monthly payments yet to be made will produce more than is needed to pay the coupons as indicated above and the balance due on the bonds after crediting them at maturity, that excess should be restored to the borrower because it represents the original amount of loading in loans in which the borrower agrees to pay more than the title company needed to discharge his bonds and coupons.

(8) Where the balance of the monthly payments yet to be made will not produce sufficient to pay the bonds and coupons as above indicated, the borrower must make such additional payments as are necessary to meet that deficit.

(9) The borrower has no right to pay off any bond in full or in part before its maturity.

(10) The bondholders have agreed by clause 6 of the bond that their bonds may be paid off in advance,

and hence the trustee may call them on paying to the bondholder the principal of the same, as credited by their part of the sinking fund loss, one-half of one per cent. of that new principal and interest which has accrued since the last interest-paying date on the retired bonds at their original principal.

(11) The trustee has the right to permit the borrower to call any or all of his bonds on the above terms, provided it deems it for the best interest of the bondholders.

(12) Where the borrower defaults and the trustee deems it wise to precipitate all outstanding bonds and to enforce the lien of the mortgage, the debt sued on should be the total of the outstanding and unpaid bonds at the principal resulting from taking credit for their pro rata share of the sinking fund loss and interest accruing to the date of the precipitation, which interest is to be computed on the original principal of the bond.

(13) Where the trustee does not have in its hands sufficient funds to pay a bond on its new principal and at its maturity, it should not exact additional interest on the bond after maturity from the borrower unless such lack of funds was caused by the borrower's failure to make the exact number of payments which should have been made under the mortgage by the time the trustee is ready to make distribution.

A judgment was entered in conformity to these conclusions.

On this appeal the Masonic Widows' and Orphans' Home and Infirmary takes exception to so much of the judgment as adjudges (1) that where there is an aggregate payment in excess of the sum needed to pay off any series of bonds, such excess shall be returned to the borrower; (2) that where the mortgagor has currently paid in advance more than the amount required of him as monthly payments that this excess voluntary payment on the part of the mortgagor should become the loss of the bondholder; (3) that each bond having a fixed maturity date must be paid at its respective maturity date after the credit, as established by the Schmidt Case, is made as of such date.

Taking up first the question of the so-called loading in the loan, the court is of the opinion that the chan-

cellor reached the correct conclusion; that is, this loss must fall on the bondholders. The mortgage deed of trust contained this covenant:

> "That in addition to the covenants last above written and other covenants and undertakings of this instrument, and in order to create a fund to be applied on the indebtedness secured by this instrument and the interest on same, the mortgagor will deposit with the trustee monthly before the close of business on the even date of each month from this date until maturity of said indebtedness the sum of \$35.16."

Under the ruling of the Schmidt Case, the covenants of the deed of trust are part of the bond by reference. The deed of trust provided for the payment by the borrower of a specific sum monthly to the trustee in order to create a fund to be applied on the indebtedness, and the mere fact that a surplus would be created when the last payment was made to which the bondholder would not be entitled would not affect his right to claim the payments as made up to an amount sufficient to pay off his bonds and the accrued interest thereon. In truth there was no loading until the last payment was made. If the deed of trust had provided for larger but fewer payments, and the fund for the payment of the indebtedness had thus been made available in the hands of the trustee before the maturity of the bonds, the situation would not be different. Here the borrower agreed to pay to the trustee a stipulated amount monthly, and, as suggested in the chancellor's opinion, if the title company had failed with the sinking fund deposit intact the bondholders would have been entitled to the entire amount of such deposit and the borrower could have insisted that all of the deposit be paid to the bondholder. Whether the title company or the borrower would own the surplus after all payments had been made to the trustee and the bonds had been paid off is immaterial, since neither is entitled to any part of the stipulated payments until the surplus comes into being, and there is no surplus until the final monthly payment is made.

A majority of the court is of the opinion that the chancellor erred in adjudging that the loss of the prepayments, or anticipatory payments, made by Gatton and Kelly, and amounting to \$597.72, must be borne

by the bondholders. The deed of trust did not authorize the borrower to pay to the trustee more than $35.16 a month. It did obligate him to provide for the payment of the indebtedness by depositing a sufficient sum to meet impending maturities of bonds and coupons "at least three days in advance." This only contemplated a mode of payment different from the monthly payment plan in the event the latter plan failed to produce the required amounts at least three days before the maturities.

In the Schmidt Case it was held that the bond and the deed of trust must be read together. In the course of the opinion it was said:

"The documents constituted the trustee an agent for the bondholders for the purpose and with the authority to collect and to disburse the monthly payments, and conferred upon it full power to enforce the obligations. In such a situation there is no room for the contention that the bondholders can now enforce the contract contrary to its terms, or exact more than was given by the contract. The borrower has performed the contract in accordance with the terms of his obligation and the bondholders who acquired their rights from the trustee legally consented for the borrower to discharge his contract in the manner required by the mortgage."

The borrower in that case made only the specific payments required by the mortgage, but here by making payments in advance he has gone beyond the clear intendment of the instrument. The authority of the title company to act as the agent of the bondholders must be found in the bond and the deed of trust, and that authority should clearly appear before bondholders can be bound. The only payments the borrower was entitled, or required, to make to the title company were the monthly payments of $35.16, and these were the only payments the title company was entitled to collect as the agent of the bondholders. The prepayments in this case amounting to $597.72 should not be credited as a payment on the bonds held by the defendants. The loss to be borne by the bondholders, therefore, is the difference between the amount of the 68 payments made to the trustee by the borrower prior to June 22, 1931, as authorized by the deed of trust, and the portion of such trust funds for which the trustee

had accounted by retiring bonds and paying accrued interest.

This loss should fall equally on all bonds irrespective of their maturities, which affirms the ruling of the chancellor on this point. The bonds are of equal rank as to security, and as said by the chancellor in his opinion,

"Certainly there is no principle of equity which requires the holders of obligations of equal rank in their right of resort to the mortgage security, but of differing maturities with regard to their payment by the debtor, to be so unequally treated merely because the trustee of the security and the collector of part payments on the debt becomes insolvent and loses a part of the payments theretofore collected by it. On the contrary, such treatment is in the teeth of the maxim that 'Equality is Equity.' One effect of the maxim is to satisfy all demands of equal dignity with respect to the security equally out of that security where it is inadequate even though they are of differing maturities."

See Hargis Bank & Trust Company v. Gambill, 234 Ky. 538, 28 S. W. (2d) 769, where the earlier authorities are reviewed. Where bonds of different maturity are secured by the same mortgage, the pro rata rule, requiring the holders of the bonds to share ratably in the proceeds of the mortgage security where there is a deficiency in the security, is generally applied. See annotation to Chatten v. Knoxville Trust Company, 50 A. L. R. 543. Here the debtor has not defaulted and no recourse has been had to the security, but a portion of the proceeds paid to the trustee, or custodian, has been lost, and by a parity of reasoning the pro rata rule should apply in allocating this loss.

The chancellor held that a new principal sum must be fixed for each bond in order to be able to adhere to the bond maturities in making future distributions, and that this new principal must be arrived at by crediting each of the bonds with its share of the sinking fund loss. He fixed the maturity of each bond as the proper date for making the credit. He points out in his opinion the confusion that would arise by reason of selecting any of the other dates suggested, and, for reasons

of convenience and fairness to all concerned, we think the judgment in this respect is correct.

There are other questions discussed in briefs of counsel but they were not considered below, and it appears from the record that these questions have been raised in other cases now pending, and we refrain from passing on them. All questions not expressly passed on are reserved. Our conclusions on the disputed questions briefly summarized are as follows: (1) All sums paid to the title company by the borrower in strict accordance with the provisions of the deed of trust, that is, 68 payments of $35.16 each, were received by it as trustee for the bondholders. (2) The 17 payments due under the terms of the deed of trust subsequent to June 22, 1931, but made by the borrower before that date, and referred to as prepayments were not received by the title company as trustee for the bondholders, and the loss of this sum must fall on the borrower. (3) The sinking fund loss, or the amount which the borrower is entitled to treat as a credit against the balance of his debt, is to be computed by subtracting from the total amount of the 68 payments due under the deed of trust prior to June 22, 1931, and received by the title company the total amount of bonds and coupons paid off by it before it closed. (4) The loss thus determined must be distributed ratably among the outstanding bonds irrespective of their maturity. (5) That credit after the payment of interest as directed by the chancellor in paragraph 4 of the statement of his conclusions heretofore quoted will be applied pro rata on each bond at its maturity.

The writer of this opinion does not concur in the conclusion that the loss of the prepayments amounting to $597.72 should fall on the borrower. He is of the opinion that, under the ruling of the Schmidt Case, this loss must fall on the bondholders.

The judgment is reversed in so far only as it adjudges that the loss of the prepayments must be borne by the bondholders, and in all other respects it is affirmed, with directions to enter a judgment conforming hereto.

The whole court sitting, except Chief Justice Dietzman.