**LOUISVILLE TRUST CO. v. GLENN, Collector of Internal Revenue, et al.**

No. 541.

District Court, W. D. Kentucky, Louisville Division.

March 30, 1946.

Motion to Modify Judgment Denied Aug. 2, 1946.

Samuel O. Clark, Jr., Asst. Atty. Gen., Andrew D. Sharpe, Homer R. Miller, and Robert R. Reynolds, Jr., Sp. Assts. to Atty. Gen., and David C. Walls, U. S. Atty., of Louisville, Ky., for plaintiff.

Allen P. Dodd, Irvin Marcus, J. Verser Conner, A. C. VanWinkle, and Woodward, Dawson, Hobson & Fulton, all of Louisville, Ky., and Frederic P. Lee, of Washington, D. C., for defendants.

MILLER, Circuit Judge.

The Louisville Trust Company filed this action asking for a Declaration of Rights with respect to a deposit standing with it in the amount of $1,053,743.60, being a part of the proceeds from the sale of whiskey warehouse receipts formerly owned by the defendant Cummins Distilleries Corporation, and against which there are conflicting claims totaling more than Three Million Dollars. S. R. Glenn, Collector of Internal Revenue for Kentucky, was originally made a party defendant because of a jeopardy assessment of income taxes against the Cummins Distilleries Corporation in the sum of $1,500,000 followed by distraint against the deposit. The United States of America subsequently intervened claiming a first and prior lien against the deposit for the payment of delinquent income taxes in the total amount of $2,255,-421.45 with interest. The Collector moved for dismissal of the action as to him. If the government's claim is a valid one, all

other claims become valueless. A small part of the claim is conceded. If further tax liability exists by reason of the facts hereinafter stated, the amount of the liability is not in dispute. This action is now submitted upon the validity of the remainder of the government's claim.

### Findings of Facts.

The controversy arises out of the dissolution of the Cummins Distilleries Corporation as of December 31, 1942. The Company was incorporated under the law of Delaware in 1933. In 1942 it had outstanding 23,519 shares of preferred stock upon which there was an accumulated dividend of $3.70 per share, and 219,207 shares of common stock. Under the certificate of incorporation the preferred stockholders had the right to the exclusive voting control when the dividends on the preferred stock were in arrears. Only one dividend of ten cents a share had been declared on the common stock. Factional differences existed among the directors and in the spring of 1942 receivership proceedings were threatened by some common and preferred stockholders. It became known in the industry that the Government would probably require, as a part of its war program, that all distilleries discontinue distillation of beverage alcohol. By reason of these conditions, the directors considered liquidation of the corporation at a meeting on August 10, 1942, but made no decision. At a meeting of the board on November 30, 1942, the directors recommended to the stockholders that the corporation be liquidated and dissolved. A stockholders' meeting was called for December 24, 1942. At that meeting the stockholders authorized dissolution and complete liquidation of the corporation. They adopted a comprehensive detailed plan of liquidation which provided that the directors pay $16.20 per share to the holders of the preferred stock and make provision for the payment or release of all of the Company's obligations, and thereafter distribute the assets to the common stockholders, on or before July 15, 1945, either in kind or in cash in cancellation of their stock. Thereafter, at a directors' meeting held on the same day, the board adopted the plan of liquidation approved by the stockholders, directed the executive officers to set aside out of the assets of the corporation an amount thereof adequate for the payment or settlement of all the Company's obliga-

tions and to pay the preferred stockholders $16.20 per share and then adopted a resolution that pursuant to the plan and in conformity with the provisions thereof "a distribution in liquidation be made, and the same is hereby declared to be now made, to bona fide owners of the common stock of the Company" as of December 26, 1942, consisting of the net equity of the Company in whiskey warehouse receipts representing 51,694 barrels of whiskey. The executive officers were authorized to do all things necessary to transfer the same to the stockholders entitled thereto. A bid of $300,000 for the distillery and book value for the other assets of the corporation was accepted and the officers were authorized to convey this property to the purchaser. The officers thereafter conveyed the distillery and other property to the purchaser and made provision for the payment of the preferred stockholders and all known debts and taxes.

On December 25, 1942, some of the larger stockholders discussed the advisability of appointing a stockholders' committee which could act for the stockholders and eliminate some of the difficulties in distributing to each of the individual stockholders the exact portion of the warehouse receipts to which he was entitled. There was also involved the practical problem of liquidating the corporation's loans and converting the equity in the warehouse receipts into cash. The warehouse receipts had been pledged to various banks to secure a corporate indebtedness of approximately $1,113,000. These stockholders agreed on W. M. Morrison, who was Vice President and Treasurer of the corporation and a large stockholder, Max Waldman, who had served as accountant for the corporation, and William Wagner, a member of a brokerage firm which had distributed considerable stock of the Company, as a stockholders' committee. A document was drawn to this effect which authorized the committee to receive from the Company and to receipt for any evidence of title to assets "heretofore transferred to the individual stockholders jointly or otherwise" and to sell any assets received in kind, and to distribute the proceeds from such sale to the stockholders of the corporation. This document was circulated among the stockholders who could be immediately reached and was signed by the owners of 80% of the stock. These same stockholders executed a document which authorized the

corporation to deliver to the committee the warehouse receipts to which they were entitled. These same stockholders also executed a third document addressed to the corporation to the effect that they believed it to be for the best interests of all that the committee which they had appointed should also act for the other 20% of the stockholders who had not signed the agreement appointing the committee, and they requested the corporation to deliver to the committee the warehouse receipts to which the other 20% were entitled. They agreed to protect and indemnify the Company, its directors and officers against any claims arising out of the assignment and delivery to them of any assets comprising the distribution in kind, and to cause the Company to be released of its bank indebtedness of approximately $1,113,000. On December 28, 1942, the corporation, pursuant to the action of the board of directors on December 24th and to the instruments just referred to, executed two assignments, by one of which it transferred its equity in 80% of the warehouse receipts to the stockholders who had appointed the committee, and by the other of which it transferred its equity in 20% of the warehouse receipts to the owners of the 20% of the stock who had not signed the instrument appointing the committee. The Court finds that the stockholders' committee was selected and appointed by the stockholders as individuals after the liquidating dividend of December 24, 1942, and not by the corporation, and acted and purported to act for the stockholders as individuals, and not for the corporation, in all of its transactions thereafter.

The corporation had in the meantime caused its indebtedness to banks in various cities to be consolidated in one loan from the Continental Illinois National Bank and Trust Company of Chicago totaling $1,113,784.61, which bank also acquired possession of the warehouse receipts as security for the loan. On December 29, 1942 the corporation issued and delivered to the committee substitute warehouse receipts which were not then validated, but which were to be validated and substituted for the original certificates upon the committee securing the release of the corporation from the indebtedness to the Chicago bank. The committee immediately went to Chicago, where on December 30, 1942, it executed its own note for $1,113,784.61 to the Continental Bank. As collateral for the committee's note, the committee caused the substitute warehouse receipts to be validated and pledged them to the bank. The committee used the proceeds from the bank's loan to it to pay off the corporation's note which the bank cancelled and returned to the corporation. The committee at the same time caused the original warehouse receipts which the bank had held as collateral on the corporation's note to be cancelled and destroyed. Immediately thereafter the committee met with L. A. Weiss, a large whiskey broker, in his office in Chicago. Weiss advised the members of the committee of a news item which appeared in a New York paper of that date to the effect that a ceiling price on sales of warehouse receipts would probably be imposed by the OPA in the near future. The probable ceiling price appeared materially less than the then market price. The committee discussed with Weiss the advisability of an immediate sale. After checking on the report and discussing the matter the committee then authorized Weiss to sell the warehouse receipts at prices then fixed. Prior to that time Weiss had not negotiated or made, either for the corporation or for the committee, any sale of any of these warehouse receipts or the whiskey represented thereby. The corporation had some time prior thereto indicated in a general way that it would possibly sell this whiskey at a later time, but with no definite time, purchasers, or sales prices mentioned. The market for such warehouse receipts was firm, but the corporation had not negotiated with any purchaser for the sale of the receipts. Weiss had not been employed by the committee and had no authority from the committee to act for it in the sale of the warehouse receipts until he was so authorized by the committee on the late afternoon of December 30, 1942, following the conference of the committee and its decision to make an immediate sale of the warehouse receipts above referred to. Following such authorization from the committee, Weiss negotiated with several probable purchasers over the long distance telephone and obtained commitments covering all the warehouse receipts, but with the understanding that the exact quantity to be allocated to each purchaser would be decided during the following few days. The committee then returned to Louisville. On January 4, 1943, Morrison and Wagner again went to Chicago and the following sales were closed:

Jan. 4, 1943, Stuart-Williams Co., warehouse receipts for 1226 barrels of whiskey,   $ 136,740.15

Jan. 6, 1943, Kiefer-Stuart Co., warehouse receipts for 2186 barrels,   201,631.90

Jan. 6, 1943, Calvert Distilling Co., warehouse receipts for 22,137 barrels,   1,663,740.80

Jan. 8, 1943, National Distillers Products Co., warehouse receipts for 19,362 barrels,   1,574,650.12

Jan. 13, 1943, L. A. Weiss & Co., warehouse receipts for 2449 barrels,   483,067.38

Jan. 14, 1943, R. L. Buse Co., warehouse receipts for 1361 barrels of whiskey,   121,118.28

The delivery of the receipts and payment of the purchase price followed promptly. The committee deposited the proceeds therefrom in the Continental Bank to the credit of Cummins Stockholders' Distribution Committee. Out of these proceeds the committee paid off its note to the Continental Bank. The committee then transferred from the Continental Bank in Chicago to a deposit in the name of the committee at the Louisville Trust Company in Louisville, Kentucky, the plaintiff herein, $3,000,000 of the purchase money.

On January 20, 1943, the committee employed the Louisville Trust Company as its agent to make distribution of the three million dollars to the stockholders of Cummins Distilleries Corporation. On January 21, 1943, it mailed to each stockholder of the corporation its report of its action hereinabove set out. This report stated that there would be a distribution of approximately $13.75 per share to the owners of common stock of record at the close of business December 26, 1942, and that a first payment of $13.50 per share in cash would be made by the Louisville Trust Company to persons entitled thereto upon presentation of stock certificates duly endorsed. On the same day The Louisville Trust Company mailed to each of the common stockholders of the corporation a letter advising them of the proposed payment and calling upon them for delivery of the stock certificates properly endorsed to its Trust Department for the purpose of receiving this distribution and any future distributions, and, of surrendering said certificates for cancellation in exchange for

a non-negotiable receipt. By January 26, 1943, the stockholders had sent in their stock in response to these notices in the following amounts:

| | |
|---|---|
| Total shares outstanding | 219,207 |
| Shares delivered or mailed in | 197,289 |
| Said shares not heard from | 21,918 |

Checks were issued and subsequently paid by The Louisville Trust Company at $13.50 per share on 148,110 shares, in a total amount of $1,999,485. Checks were also issued but not paid for 15,195 shares. Checks were not issued for 33,984 shares. On January 26, 1943, the Collector of Internal Revenue made a jeopardy assessment against the Cummins Distilleries Corporation of $1,500,000, on the theory that the sales of the warehouse receipts were made by the corporation and not by the stockholders as individuals, resulting in a profit to the corporation upon which an income tax was payable. The Collector levied on all funds to the credit of the Cummins Stockholders' Distribution Committee in The Louisville Trust Company, which stopped payment of the outstanding checks issued by The Louisville Trust Company to the common stockholders. He also levied on funds which had been delivered to The Louisville Trust Company by the corporation for the purpose of the retirement of its preferred stock, and also on funds paid by the corporation to The Louisville Trust Company in payment of the balance of an outstanding mortgage indebtedness. He also levied on all funds on deposit to the credit of the corporation in its regular checking account in the Security Bank of Louisville, Kentucky. These funds have been frozen in the banks since that time. The United States subsequently made additional assessments against the corporation for the taxable year ending August 31, 1942, and for the taxable year beginning September 1, 1942, and ending January 26, 1943. These assessments and other facts, not necessary to be here restated, are set out in the stipulation and amended stipulation filed by the parties herein, which is adopted as a part of these findings. This stipulation provides that the sole question as to the tax liability of the Cummins Distilleries Corporation now presented for decision is whether or not gains resulting from all the sales, or any of them, of warehouse receipts for 51,694 barrels of whiskey are attributable to the corpora-

tion, and that if it is determined by the Court that the entire gain derived from the sale of the whiskey warehouse receipts is legally taxable to the corporation, then it is agreed that the correct amount of the taxable gain was $2,911,953.73.

The State of Delaware issued its "Certificate of Dissolution" of Cummins Distilleries Corporation on December 31, 1942.

### Conclusions of Law and Opinion. •

▮▮▮ Before considering the exact question presented by this case, it is helpful to briefly restate and consider two principles of law of federal income taxation, both of which have been stated and approved numerous times by the Supreme Court. One of these principles is that the legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, can not be doubted. It was so held by the Supreme Court as early as 1873 in United States v. Isham, 17 Wall. 496, 506, 21 L.Ed. 728. It was specifically restated by the Court in Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355. It was just recently restated and again approved by the Court in Commissioner v. Tower, 66 S.Ct. 532. The rule has consistently been recognized by other federal courts. See Jones v. Helvering, 63 App.D. C. 204, 71 F.2d 214, 217; Meurer Steel Barrel Company v. Commissioner, 3 Cir., 144 F.2d 282, 284. The other principle referred to is that tax consequences which arise from gains from a sale of property are not to be determined solely by the means employed to transfer the legal title, but the government may look at actualities and view the transaction as a whole, and if the form employed is unreal or does not change the flow of economic benefits its effect may be disregarded. This rule was also just recently restated by the Court in Commissioner v. Court Holding Company, 324 U.S. 331, 334, 65 S.Ct. 707. Earlier statements of the rule and applications of it to the particular facts involved are Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596, 97 A.L.R. 1355; Minnesota Tea Company v. Helvering, 302 U.S. 609, 58 S.Ct. 393, 82 L.Ed. 513; Griffiths v. Commissioner, 308 U.S. 355, 60 S.Ct. 277, 84 L.Ed. 319; Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406. See also Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788; Commissioner

v. Tower, supra. To some extent these principles appear conflicting, in that they appear to hold (1) that a motive or purpose on the part of the taxpayer to reduce or avoid taxation does not invalidate a transaction otherwise legal in form and (2) that regardless of the form used where the object of the transaction is tax avoidance the tax consequences will flow from the substance of the transaction rather than from the form into which it is cast. An analysis and explanation of this apparent conflict is made by the Circuit Court of Appeals for the 2nd Circuit in Chisholm v. Commissioner, 79 F.2d 14, 15, 101 A.L. R. 200, where it is pointed out that the purpose to avoid taxation can not be the basis of liability, but where the purpose contradicts or defeats the apparent transaction, it is that purpose, rather than the purpose to escape taxation, which permits the Court to disregard the form. This distinction may or may not be a satisfactory explanation of the apparently conflicting rulings, but it is clear from a reading of the cases that the Supreme Court still recognizes and approves the rule that the taxpayer's purpose or motive to avoid taxation does not *by itself* invalidate the transaction. This really means that the decision in each case depends largely upon its own facts and that other factors such as reallocation of economic benefits within the family unit, fraud, or lack of good faith, when coupled with the purpose to avoid taxation, are sufficient at times to warrant the rejection by the Court of the proceedings in their entirety.

In line with these principles the transactions involved in this case are not to be condemned merely because the purpose behind them was to avoid a tax liability of approximately two million dollars. Great emphasis is laid throughout the Government's brief on this result. But it is clear from the foregoing that such a purpose and such a result is not sufficient *by itself* to impose such a liability. The cases relied upon by the Government contain additional factors. Such additional factors do not exist in the present case. It does not involve in any way the question of reallocation of economic benefits within the family unit, which has been of controlling importance in establishing the rulings in Helvering v. Clifford, supra, and Commissioner v. Tower, supra, and similar cases. The Government has conceded that no question of fraud is in any way involved.

There is no question but that bona fide sales of warehouse receipts actually were made at prevailing market prices to purchasers entirely free of any direct or indirect control on the part of the seller either through corporate connections, family relationship, or otherwise. Stripped of these factors, which have complicated the situation in so many other cases, the present case presents a rather plain and simple issue—were the sales in question made by the committee on behalf of the corporation or on behalf of stockholders as individuals? If made on behalf of the corporation the tax liability herein asserted was incurred by the corporation. If made on behalf of the stockholders as individuals, the corporation incurred no tax liability, but the individuals incurred their separate individual liability based on the profit received through liquidation, being the difference between what each one received and what he paid for his stock in the corporation.

The answer to that question, after disposing of a preliminary question of law, is really one of fact rather than one of law, presenting two phases. First, did the corporation appoint the committee so as to make it its agent, or did the individuals appoint the committee, and for whom did the committee purport to act. Second, even conceding that the individuals appointed the committee, did the committee carry out a contract with the purchasers of the whiskey which the corporation had previously made or negotiated so as to make it in fact a sale by the corporation. The cases which uphold tax liability in transactions of the present type are based upon either one or the other of those two facts. No other basis of liability is pronounced by them. They are referred to hereinafter.

As a preliminary question of law it is, of course, recognized that unless the corporate actions in December were sufficient to transfer to the stockholders the title to the warehouse receipts the subsequent attempt on the part of the individual stockholders to appoint a committee to represent them in the sale of the warehouse receipts was a nullity, and any sale so made was a sale on behalf of the corporation. It is also recognized, as is provided by existing treasury regulations, that when a corporation is dissolved its affairs are usually wound up by a receiver or trustees in dissolution, that such receiver or trustees stand in place of the corporation for the purpose of liquidating the assets

and paying the debts, and that any sales of property made by them are to be treated as if made by the corporation for the purpose of ascertaining the gain or loss. But the corollary of this is equally as sound, namely, that no gain or loss is realized by a corporation from the distribution of its assets in kind upon dissolution, and that a corporation can be legally liquidated in such a way without employing the services of a receiver or trustees in dissolution. With these principles so recognized the Government contends that there was no distribution by the corporation of its assets in kind but that the committee was in fact a liquidating committee which received the assets from the corporation rather than from the stockholders as individuals who had previously received them from the corporation through a distribution in kind. In support of this contention it is pointed out that it was a practical impossibility to distribute the whiskey in kind to the individual stockholders due to the variable number of shares owned by different stockholders and to the different dates of distillation of the whiskey involved, that physical delivery of the warehouse receipts was impossible because they were in the possession of the Continental Bank in Chicago, that the warehouse receipts were pledged to the Continental Bank to secure the payment of an indebtedness owed to the bank by the corporation, that the stockholders were not called upon to turn in their shares for cancellation upon the declaration of the so-called dividend but were required to surrender them only when the corporation's indebtedness had been liquidated and a liquidating cash dividend made available, and to other minor incidents involved in the process of selling the warehouse receipts and distributing the net proceeds therefrom. None of these facts, however, set aside or invalidate the legal effect of the corporate actions culminating in the action of the Board of Directors on December 24, 1942, whatever that legal result might be. While they may have presented some practical difficulties to be considered by the stockholders and by the board of directors which might have made it inadvisable to make a distribution in kind, yet it was for the stockholders and directors to decide whether in spite of these difficulties and disadvantages it was nevertheless the intent and purpose of the corporation to actually make a distribution in kind. A reading of the resolution adopt-

ed by the directors on December 24, 1942, plainly shows that it was their intent and purpose to actually make a distribution in kind at that time. The resolution recites that a distribution in liquidation "is hereby declared to be *now* made, to bona fide owners of the common stock of the Company, as shown by the stock record book of the Company, at the close of business on December 26, 1942 * * * consisting of the net equity of the Company in and to the whiskey warehouse receipts representing an aggregate of 51,694 barrels of whiskey owned by it, as shown by a list filed with the minutes of this meeting marked Exhibit Y." This resolution did not declare that it was the purpose to make a distribution in kind at a later time; on the contrary it actually declared one to be then made at that time. Such is the usual form of a valid declaration of dividend by the directors of a corporation. Such action immediately creates vested rights in the stockholders. Until such action by the board of directors the stockholders have only a potential right. When such a declaration has once been made it can not be rescinded, and the stockholders have been immediately changed with respect to the distribution involved, from stockholders to creditors. The unconditional title to the money or property actually vests as a matter of law in the stockholder at that time. Fletcher, Cyc. Corps., P. 786, Paragraph 5322; Fidelity & Columbia Trust Co. v. Louisville R. Company, 265 Ky. 820, 97 S. W.2d 825; Taylor v. Axton-Fisher Tobacco Co., 295 Ky. 226, 173 S.W.2d 377, 148 A.L.R. 834; Commissioner v. Scatena, 9 Cir., 85 F.2d 729, 731. See Novo Trading Corporation v. Commissioner, 2 Cir., 113 F.2d 320, 322. The validity of such a declaration and the resulting transfer of title to the stockholders is in no way affected by the fact that the warehouse receipts were then pledged with the Continental Bank of Chicago for a corporate debt, and that the transfer of title was made subject to such indebtedness. Numerous cases have held that a corporation can make a valid liquidating dividend in kind to its stockholders jointly, even though the property so transferred is subject to an existing mortgage indebtedness which is paid off by the stockholders at a later time following receipt of the liquidating dividend. Hines v. United States, 7 Cir., 90 F.2d 957; Snead v. Elmore, 5 Cir., 59 F.2d 312; Chisholm v. Commissioner,

2 Cir., 79 F.2d 14; Novo Trading Corporation v. Commissioner, 2 Cir., supra. See First National Bank v. Bowman, 168 Ky. 433, 182 S.W. 195. In the present case, although it was probably unnecessary in order to legally effect the transfer of title, the corporation, in addition to its resolution, actually executed and delivered to the stockholders an assignment of its interest in the warehouse receipts. The corporation also issued duplicate warehouse receipts with authority for their validation upon surrender and cancellation of the outstanding ones, which in practical effect was actual delivery of the corporation's net equity in the warehouse receipts then pledged to the Continental Bank. Accordingly, I am of the opinion that the corporate resolutions and actions referred to constituted a valid declaration of a liquidating dividend in kind to the stockholders, and actually passed to the stockholders at that time unconditional title to the corporation's net equity in the whiskey so represented by the warehouse receipts.

We return to a consideration of the first of the two questions of fact referred to above, namely, did the corporation appoint the committee or did the individuals appoint the committee, and for whom did the committee purport to act? There is very little, if any, evidence in the record to sustain the Government's contention that as a question of fact the corporation appointed the committee. The overwhelming weight of the evidence is that the stockholders as individuals appointed the committee after the liquidating dividend had been declared. The three members of the committee, namely, Morrison, Waldman and Wagner, testified that they were appointed after the liquidating dividend by the stockholders as individuals, following informal discussions between a number of them concerning the creation and appointment of such a committee. A. J. Cummins, president of the corporation, testified to the same effect. Louis J. Newman, vice-president and general manager of the corporation, who was instrumental in having the committee formed, likewise testified to the same effect. The committee had its own offices separate from the corporation in an entirely different building. Its business was conducted as a unit unconnected in any way with the corporate affairs. The record is barren of any corporate action naming the members of this committee or authorizing them in any

way to act for the corporation. As has been well pointed out by counsel for the corporation, if the committee assumed to act on behalf of the corporation and its authority to so act was questioned, to what could the committee point to sustain its contention. The Government's position is in effect to ignore such evidence and to rely upon a broad general statement of law to the effect that where "the dominant stockholders or their agents receive the corporate assets in order that the corporation may be liquidated and the proceeds distributed to the stockholders the dominant stockholders are regarded as liquidating agents or trustees of the corporation in the sale or other disposition of such assets." A number of cases, including two from this Circuit, are cited in support of that statement of law. They do not support the statement. Each case involved the additional factor of the appointment of a liquidating agent by *corporate action.* I refer to them briefly. In Burnet v. Lexington Ice & Coal Company, 4 Cir., 62 F.2d 906, the liquidating agent was appointed by the corporation through a resolution of its board of directors. In Hellebush v. Commissioner, 6 Cir., 65 F.2d 902, the liquidating trustees were appointed by the corporation through a resolution passed at a special meeting of the stockholders. The validity of this appointment was questionable, and the case was actually decided upon the fact that the sale was made to a purchaser with whom the corporation had previously negotiated and closed the deal in question. In Whitney Realty Company v. Commissioner, 6 Cir., 80 F.2d 429, the liquidating trustee was appointed by the corporation through a resolution adopted at a stockholders' meeting prior to the conveyance of the corporate assets to the trustee. In First National Bank of Greeley v. United States, 10 Cir., 86 F.2d 938, the corporation selected the trustee before dissolution and transferred its property to the trustee with specific instructions. In Taylor Oil & Gas Company v. Commissioner, 5 Cir., 47 F.2d 108, the corporation appointed the directors of the Company as its liquidating trustees through a resolution passed at a stockholders' meeting. In Tazewell Electric Light & Power Company v. Strother, 4 Cir., 84 F.2d 327, the corporation selected the trustee through a resolution passed at a stockholders' meeting. In each of these cases the Court adjudged tax liability against the corporation,

and correctly so. In each case the liquidating agent was selected, clothed with authority and instructed as to his duties by corporate action. The corporate assets were conveyed by the corporation directly to him following the appointment. The situations were radically different from the one in the present case, where dissolution and conveyance of the corporate assets was to the stockholders instead of to a trustee, where such conveyance was prior to the appointment of any committee or trustee rather than subsequent to such an appointment, and where the personnel of the committee was selected and clothed with authority by the stockholders, acting as individuals instead of by virtue of any corporate action whatsoever. The finding necessarily follows that the committee was appointed by the stockholders as individuals and not by the corporation, and that it at no time purported to act in any way for or on behalf of the corporation.

It is conceded by the defendants that if the committee carried out a contract previously made or negotiated by the corporation, it would as a matter of law be construed as a sale by the corporation, with resulting tax liability against the corporation. The cases relied upon by the Government so hold. Commissioner v. Court Holding Company, 324 U.S. 331, 65 S.Ct. 707; Hellebush v. Commissioner, 6 Cir., supra; Taylor Oil and Gas Company v. Commissioner, 5 Cir., supra; Embry Realty Company v. Glenn, 6 Cir., 116 F.2d 682. But there is very little, if any, direct evidence that the committee carried out any contract previously made or negotiated by the corporation. On this second question of fact the evidence is practically uncontradicted that the committee did not consummate any contract previously negotiated by the corporation. We have the unequivocal testimony of Morrison, Waldman and Wagner that the committee had no intention of selling the warehouse receipts in the immediate future when they went to Chicago to obtain possession of them from the Continental Bank, and that no agreement existed with Weiss by which he had been authorized to sell the receipts. Weiss likewise testified that no such commitment existed. His employment by the committee came later. The evidence is very direct and positive that the sales herein involved were negotiated and closed by the committee through Weiss after the committee arrived in Chicago and after they

had secured possession of the warehouse receipts. It is not disputed that the selection of the particular purchasers, the amount of whiskey allocated to each, and the purchase price, were agreed upon after the committee acquired possession of the receipts. The Government attempts to meet this weight of the evidence by relying upon several isolated occurrences from which the Court is asked to make a deduction that the corporation had previously negotiated the sales later made by the committee. Such deductions do not follow. The Government stresses the fact that the corporation had expressed some time prior a general purpose on its part to sell its whiskey in the near future. That is entirely different from actual negotiations for a sale. A firm market price for warehouse receipts (another fact strongly relied upon by the Government) is also entirely· different from a contract of sale actually fixing the price to be paid. No case is cited by the Government which goes as far as to hold that a general purpose to sell to unselected purchasers at an indefinite time in the future, even though the market price be firm, is equivalent to the actual negotiation of a prior contract by the corporation. The Court's finding that the committee did not carry out any contract of sale previously negotiated by the corporation appears supported by the great weight of the evidence.

One other case relied upon by the Government should be briefly commented upon. In S. A. Macqueen Company v. Commissioner, 3 Cir., 67 F.2d 857, tax liability was adjudged against the corporation because the sale by the corporation to the president for a consideration of $85,000 and the immediate subsequent resale by the president to another purchaser for a consideration of $150,000 was not a bona fide transaction. Incidentally this same criticism was directed by the Court against the sale in Embry Realty Company v. Glenn, supra, where the corporation sold property to its stockholders for a consideration of $15,000 and the stockholders shortly thereafter. resold the same property for a consideration of $30,000. Both cases involved sales that were obviously shams and lacking in good faith. No such factor exists in the present case.

It follows from the foregoing, as a matter of law, and the Court so finds, that the sales of the warehouse receipts were on behalf of the stockholders individually and are not chargeable to the corporation. It has been so held in other similar cases. Commissioner v. Falcon Co., 5 Cir., 127 F. 2d 277; The Harbor Holding Company, 1 T.C. 1214; Williams, Transferee of Seekonk Corporation v. Commissioner, 3 T.C. 1002. See Chisholm v. Commissioner, 2 Cir., 79 F.2d 14, 101 A.L.R. 200.

The Government also contends that the committee was not appointed by the stockholders and could not act for the stockholders because only 80% of the stockholders joined in its appointment. It is pointed out that the committee had no authority to receive the undivided interest of the remaining 20% of the stockholders or to sell that interest on their behalf. However, the committee undertook to so act for the 20%. Conceding that its action in this respect was unauthorized, yet it is a well established rule of principal and agent that the unauthorized act of an agent may be later ratified by the principal for whom the agent assumes to act, and when such action is so ratified it is as if the principal had given original authority to the agent to that effect and the ratification relates back to the time of the act which is ratified. The principal must disavow the act of his agent within a reasonable time after the fact has come to his knowledge, or he will be deemed to have ratified it. Clews v. Jamieson, 182 U.S. 461, 483, 21 S.Ct. 845, 45 L.Ed. 1183. The committee in this case made a report to the stockholders on January 21, 1942 which stated the facts in full. This was sent both to the stockholders who appointed the committee and to the 20% who had not joined in the appointment. No stockholder objected in any way to what the committee had done on their behalf. Accordingly, the committee's transactions on behalf of the stockholders who had not joined in its selection were ratified and validated to the same effect as if they had previously authorized the committee to so act. A somewhat similar situation was approved by the Court in Hines v. United States, 7 Cir., supra.

I do not believe that the transactions between certain stockholders of the corporation and Charles J. Sipple and Maurice Frank in October and November of 1942, upon which the Government relies strongly, have ·any real bearing upon the issues involved in this case. Certain stock-

 

holders gave to Sipple and Frank, who were interested in securing control of the corporation, an option to purchase their stock. The stockholders later withdrew the option after being advised by their attorney that the Securities and Exchange Commission would not approve the deal. Frank had associated with him in the matter L. A. Weiss, a whiskey broker in Chicago. Frank and Weiss would not agree to the revocation of the option and negotiations thereafter ensued leading to a settlement of the dispute on November 28, 1942. This settlement obligated the stockholders to vote their stock for liquidation of the corporation at a stockholders' meeting to be held on November 20, 1942, and to pay to Frank and Weiss one-half of whatever they received in liquidation in excess of $7 for each share of common stock. A brief answer to the Government's argument is that this transaction was purely a contract by individual stockholders as individuals in which the corporation did not participate in any way. The evidence shows that four of the seven directors of the corporation did not even know of the transactions until after they had occurred. The corporation is in no way responsible for the individual transactions of its stockholders.

The foregoing views make unnecessary a ruling on the question of priority between the Government and the George W. Dant Estate. But since the question is raised and briefed the Court will rule on it for whatever purpose it may serve. The Estate received a check from The Louisville Trust Company for $10,250 in payment of bonds held by it, secured by mortgage against the corporation's real estate. The corporation had deposited with the Trust Company funds for the payment of this mortgage in full, and the Trust Company as Trustee under the mortgage had released the mortgage lien. The check did not clear before the deposit was frozen by the action of the Collector. The Dant Estate claims priority against that deposit even if the Government's claim should be held a valid one, and the Court so holds. Masonic Widows & Orphans' Home v. Title Insurance & Trust Co., 248 Ky. 787, 59 S.W.2d 987; Fidelity & Columbia Trust Co. v. Schmidt, 245 Ky. 432, 53 S.W.2d 713.

The claim of the Government for the deficiency tax against the Cummins Distilleries Corporation arising out of the sale of the warehouse receipts in question is dismissed. The motion of the defendant Glenn, Collector of Internal Revenue, that the action be dismissed as to him, is sustained.